UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN JAY DITTRICH,

       Petitioner,

v.                            CASE NO. 6:05-cv-1289-Orl-31UAM

SECRETARY FLORIDA DEPARTMENT
OF CORRECTIONS, et al,

       Respondents.

_____

## ORDER

       This case is before the Court on the Petition for Habeas Corpus Relief and Memorandum of Law filed by John Jay Dittrich.  (Doc. Nos. 1 & 11).  Pursuant to the instructions of the Court, Respondents filed a Response to the Petition for Habeas Corpus Relief.  (Doc. No. 15).  Thereafter, Petitioner filed a Reply to the Response.  (Doc. No. 27).

## I.    BACKGROUND

**A.    Procedural History and Factual Background**

       On April 5, 1999, Petitioner and Anthony Villacana ("Villacana"), were charged by indictment with first-degree murder of Amy Braccio.  (App. B at 106).  Specifically, the indictment charged that Petitioner and Villacana did, "in violation of Florida Statutes 782.04, from a premeditated design to effect the death of Amy Braccio, murder Amy Braccio . . . by delivering or administering to her a fatal overdose of cocaine and/or heroin or by decapitating her."  *Id.*  The State waived the death penalty.  *Id.* at 177.

On October 18, 2000, Villacana entered a plea of guilty to second-degree murder and agreed to provide truthful testimony regarding the murder of Amy Braccio.[1] *Id.* at 87-105.  The state trial court sentenced Villacana to twenty-three years in prison.  *Id.*

Petitioner proceeded to trial by jury on February 26 through March 2, 2001.  (App. A).  The State called Villacana, Albert Bass ("Bass"), and Bruce Fatigate ("Fatigate"), to testify regarding the roles they and Petitioner played in Amy Braccio's death.   (App. A at 511-58 (testimony of Villacana); *id.* at 336-402 (testimony of Bass);[2] *id.* at 439-86 (testimony of Fatigate)).[3]  The State

---

[1]Villacana testified that he had previously been convicted of five felonies, and he had pled guilty to the second-degree murder of Amy Braccio pursuant to a plea agreement which required that he testify truthfully.  (App. A at 511-57).  He further testified that at the time of Amy Braccio's murder he used and sold drugs, and Petitioner supplied him with cocaine.  Before Amy Braccio's death in January of 1998, Petitioner told Villacana that he believed she had provided information to the police regarding Petitioner's drug activities, and he instructed Villacana to give her enough heroin and cocaine to kill her.  Villacana agreed to Petitioner's request because he did not want to be cut off from his source of cocaine.

According to Villacana, he obtained the necessary drugs and needles to kill Amy Braccio from Bass, who also sold cocaine for Petitioner.  Villacana explained that he filled six syringes with the drugs and provided three of them to Amy Braccio in her bedroom.  While Amy Braccio was injecting herself with these drugs, she expressed concern that Petitioner, who had a policy against heroin use, would not approve.  Villacana then had Petitioner come into the house and assure her that it was okay with him if she took the drugs.  According to Villacana, after Amy Braccio injected herself with the contents of the third syringe she started shaking and fell to the floor, and he believed she was dead. Villacana then went to Petitioner and asked him what to do with Amy Braccio's body.  Petitioner instructed him to take her to the Ocala National Forest, chop off her head and hands, and leave her dismembered body in the open.  Villacana testified that with the assistance of Bass and the use of Petitioner's Mazda Millenium, he fulfilled Petitioner's instructions.

After murdering Amy Braccio and disposing of her body, Villacana had Petitioner's car detailed and left it in a Wal-Mart parking lot.  Villacana stayed at Petitioner's rented home for a few days, and also stayed at "Fisherman's Paradise" at Petitioner's expense.  Villacana further testified that Petitioner forgave his drug debt after Amy Braccio's murder.

[2]Bass testified that the State had given him use immunity and derivative use immunity in order for him to testify truthfully regarding Amy Braccio's murder.  (App. A at 348-50).  According

(continued...)

2

also called Cathy Harrold, James and Sharon Dees, Rhonda Upchurch, and Amy Braccio's parents to corroborate aspects of the testimony of Villacana, Bass and Fatigate. *Id.* at 558-67 (testimony of Rhonda Upchurch); *id.* at 402-12 (testimony of Cathy Harrold); *id.* at 415-17 (testimony of James Dees); *id.* at 735-41 (testimony of Sharon Dees); *id.* at 641-65 (testimony of Dawn and Neil Rushing). The State also presented testimony from Robert Cockrell regarding incriminating

---

[2](...continued)
to Bass, shortly before the murder, Cathy Harrold told him that Amy Braccio had gone to the police with a man named Keith to inform on Petitioner. Bass related this information to Petitioner who appeared to be angry and confronted Amy Braccio who denied that she was an informant. After this encounter, Petitioner told Bass to obtain heroin and needles, even though Petitioner normally had a policy against dealing or using heroin. Cathy Harrold confirmed Bass's testimony that she told him Amy Braccio was going to inform on Petitioner. Bass's half-brother, James Dees, also testified that he heard Petitioner say that Amy Braccio was a police "snitch."

Bass confirmed aspects of Villacana's testimony, including that: (1) he, Fatigate, and Villacana sold and used cocaine supplied by Petitioner; (2) on the day of Amy Braccio's murder, he provided heroin, cocaine, and needles to Villacana at Petitioner's direction; (3) Bass and Villacana carried Amy Braccio's blanket-wrapped body from her bedroom and placed her in Petitioner's Mazda Millenium; and (4) Petitioner forgave Villacana's drug debt and paid for him to stay at "Fisherman's Paradise" after Amy Braccio's death. Bass also testified that two days after Amy Braccio's murder, he helped Petitioner retrieve the Mazda Millenium from a Wal-Mart parking lot and was instructed by Petitioner to tell people that Amy Braccio had moved out with her boyfriend. Bass testified that Fatigate burned Amy Braccio's belongings and also described overhearing Villacana tell Petitioner that he had cut off Amy Braccio's head and hands, buried them, and left her body laying on the ground.

After the murder of Amy Braccio, Bass was arrested in Florida on cocaine charges, and Petitioner flew him to Tennessee after he bonded out. Bass was arrested again in Tennessee, and was placed in the same cell block as Petitioner and an inmate named Robert Cockrell.

[3]Fatigate testified that he entered into an agreement with the State to plead guilty to accessory after the fact to the first-degree murder of Amy Braccio and to testify truthfully regarding her murder. Like Bass and Villacana, Fatigate testified that in January of 1998, he used and sold drugs, and Petitioner was his drug supplier. Fatigate also confirmed Bass's testimony that he delivered heroin to Bass and, at Petitioner's direction, he disposed of Amy Braccio's belongings by burning everything except her stereo. Fatigate testified that Petitioner also instructed him to provide food to Villacana at Fisherman's Paradise because Villacana had disposed of Amy Braccio's body.

statements made by Petitioner while he, Bass, and Petitioner were incarcerated together in Tennessee.[4] *Id.* at 692-721.  Finally, the State presented the testimony of the medical examiner, a forensic toxicologist, and investigating officers.  *Id.* at 487-506 (testimony of Detective David Michael Callin ("Detective Callin")); *Id.* at 568-85 (testimony of Doctor Laura Hair); *Id.* at 585-615 (testimony of Doctor George Jackson);  *Id.* at 617-41 & 721-28 (testimony of Detective Jeff Raker ("Detective Raker")).

At the close of the States's case, Petitioner moved for judgment of acquittal, and the trial court denied the motion.  (App. A at 742-58).  Petitioner then called one witness, Errol Jackson ("Jackson"), who refused to testify pursuant to the Fifth Amendment of the United States Constitution.  *Id.* at 769-70.  After Jackson refused to testify, the Petitioner rested his case.

The jury found Petitioner guilty of first-degree murder in that he committed the offense by "Premeditated Murder" and "by Felony Murder/Trafficking in Cocaine."  (App. B at 369 (Verdict Form)).  The state trial court then sentenced Petitioner to imprisonment for life without the possibility of parole.  (App. A at 880).

On direct appeal, Petitioner raised one claim – that the trial court erred in denying his motion for judgment of acquittal.  (App. C).  On January 8, 2002, the state appellate court *per curiam*

---

[4]Several witnesses testified regarding incriminating statements made by Petitioner after Amy Braccio's death.  Fatigate testified that Petitioner commented to him that the death of his dog was Amy Braccio's revenge on him, and, after seeing a report on television regarding the discovery of Amy Braccio's decapitated body, Petitioner commented to Fatigate's girlfriend, "See what happens to people who run their mouth."  (App. A at 452).  Sharon Dees described overhearing a jovial conversation between Petitioner and Villacana when Villacana told Petitioner that he gave "her" enough heroin to put out a horse and dropped "her" off in Ocala.  *Id.* at 736-41.  James Dees testified that he heard Petitioner say that "she sold him out to the police" and was "taken care of."  *Id.* at 420-21. Finally, Robert Cockrell, who had been incarcerated with both Petitioner and Bass at a federal prison in Tennessee, testified that Petitioner told him he had a girl in Florida killed who was going to snitch on him.  *Id.* at 689-720.

affirmed.  (App. D).  On July 31, 2002, Petitioner filed a petition for writ of habeas corpus arguing that his appellate counsel provided him with ineffective assistance.  (App. E).  The state appellate court ordered the State to show cause why the relief requested should not be granted, and the State filed a detailed response on September 5, 2002.  *Id.*  The state appellate court summarily denied the state petition for writ of habeas corpus on October 17, 2002.  *Id.*

On July 25, 2002, Petitioner filed a motion for postconviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure.   (App. F).   Thereafter, Petitioner filed several amendments, supplements, and an addendum.  *Id.*  On February 17, 2004, the same state judge who presided over Petitioner's trial entered a written order summarily denying all of the claims raised in Petitioner's Rule 3.850 motion and in his various amendments, supplements, and addendum.  *Id.*  After his motion for rehearing was denied, Petitioner appealed, and the state appellate court *per curiam* affirmed.  (App. G).  Mandate issued July 15, 2004.  *Id.*

On September 28, 2004, Petitioner filed a motion to correct an illegal sentence pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure.  (App. I).  In a written order, the state trial court denied relief on February 7, 2005, and Petitioner appealed.  (App. J).  The state appellate court *per curiam* affirmed on May 17, 2005.  *Id.*  Mandate issued on July 15, 2005.  *Id.*  Two weeks later, Petitioner filed a petition for "All Writs Jurisdiction" with the Florida Supreme Court.  (App. K). The Florida Supreme Court denied the petition without a written opinion on August 1, 2005.  *Id.* One month later, Petitioner filed the instant timely petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Doc. No. 1).

## B.     Summary of Claims

In the instant petition for writ of habeas corpus, Petitioner alleges ten claims and numerous sub-claims for relief related to:  (1) the performance of his trial and appellate counsel (Claims One and Six);  (2) the actions of the prosecutor (Claims Two, Three and Seven);  (3) the rulings and actions of the trial court (Claims Five, Nine and Ten);  (4) the condition of the trial transcript (Claim Four);  and (5) the state court's resolution of his postconviction motions (Claim Eight).  *See* Doc. Nos. 1 & 11.

Petitioner alleges three claims based upon the actions and inactions of the prosecutor:  (1) Petitioner's conviction was "obtained by the unconstitutional failure of the prosecution to disclose exculpatory impeachment evidence" regarding the State's agreement with Bass that he would not be prosecuted for murder (Claim Two);  (2) the prosecutor engaged in misconduct by threatening defense witness Jackson with prosecution in order to induce him to assert his Fifth Amendment right against self-incrimination (Claim Three);  and (3) the prosecutor engaged in misconduct by calling Petitioner a "liar" and telling the jury that he "did it" (Claim Seven).

Petitioner alleges three claims of trial court error:  (1) the trial court erred in permitting Jackson "to assert a blanket right not to testify" (Claim Five);  (2) the trial court lacked jurisdiction to impose Petitioner's sentence because the "Office of the Statewide Prosecutor lacked jurisdiction to bring the one-count indictment" against him (Claim Nine);  and (3) the trial court erred in permitting the State to alter and amend the indictment (Claim Ten).  (Doc. No. 1 at 5-19).  Petitioner also claims that:  (1) he was denied due process of law because of the incomplete and inaccurate transcript of his trial (Claim Four);  and (2) the state courts violated his liberty interests by failing to issue written opinions in disposing of his motions for postconviction relief (Claim Eight).

6

Petitioner's claim that his trial counsel was ineffective is based upon five instances of allegedly deficient performance:  (1) failing to object to the trial court's acceptance of Jackson's blanket assertion of his Fifth Amendment right not to incriminate himself (Sub-Claim 6-A);  (2) "unreasonably" limiting her cross-examination of Bass (Sub-Claim 6-B);  (3) failing to object to the prosecutor calling Petitioner a liar and expressing an opinion regarding his guilt (Sub-Claim 6-C); (4) not objecting to the prosecutor's failure to provide exculpatory evidence regarding Jackson (Sub-Claim 6-D);  and  (5) failing to "set the proper predicate for appellate review" by sufficiently establishing that Bass, Fatigate,  Cockrell and Villacana "were each given a serious reduction in sentence, and/or immunity for testifying" (Sub-Claim 6-E).  (Doc. No. 1 at 15-16).

Petitioner's claim that his appellate counsel was ineffective set forth twelve instances of allegedly deficient performance.  Specifically, Petitioner claims that appellate counsel was deficient in failing to "notify the court of appeal that many sections in the trial transcript are completely missing or are indiscernible because of a malfunction in the trial court's electronic recording system"[5] (Sub-claims 1-A and 1-F), and in failing to raise the following ten arguments on appeal: (1) the trial court erred in giving "Jackson, the sole defense witness, a 'blanket' right not to testify," after the witness's assertion of his Fifth Amendment privilege against self-incrimination (Sub-Claim 1-B);  (2) the prosecutor engaged in misconduct by making improper statements during his opening statement and during closing arguments[6] (Sub-Claims 1-C and 1-E);  (3) the trial court exhibited

---

[5]This sub-claim essentially sets forth an additional sixteen sub-claims in that Petitioner identifies sixteen different portions of the transcript where error allegedly occurred.

[6]Petitioner identifies three allegedly improper statements: (1) the prosecutor's reference to Petitioner as a "drug kingpin" during his opening statement; (2) the prosecutor's statement during closing argument that Petitioner's counsel might provide answers during his closing; and (3) the
(continued...)

bias in favor of the State after Petitioner's counsel requested an "independent act" jury instruction (Sub-Claim 1-D);  (4) the trial court denied Petitioner's request for an "independent act" jury instruction (Sub-Claim 1-G);  (5) the trial court overruled Petitioner's counsel's objection and permitted "undisclosed statements" of Petitioner which amounted to "bad act" evidence to be placed before the jury without a *Richardson* hearing (Sub-Claim 1-H);  (6) the trial court refused to grant a mistrial or issue a requested curative instruction after Petitioner's counsel objected to the prosecutor's remarks during his opening statement  and closing argument (Sub-Claim 1-I);  (7) the trial court erred in overruling Petitioner's  hearsay objections[7] (Sub-Claims 1-J and 1-K);  and (8) the cumulative effect of the errors at trial "taint[ed] or contribut[ed] to the jury's verdict" (Sub-Claim 1-L).  (Doc. No. 1 at 6-13).    To facilitate resolution of Petitioner's numerous claims and sub-claims, the Court will address the issues in the following order:

A.    Claims related to the trial transcript (Claim Four and Sub-Claims 1-A and 1-F);

B.    Claims related to Errol Jackson and his assertion of his Fifth Amendment right not to incriminate himself (Claims Three and Five, and Sub-Claims 6-A, 6-D, 1-A, and 1-B);

C.    Claims related to Cockrell's testimony relating Bass's out of court statements  (Sub-Claim 1-A, 1-J and 1-K);

D.    Claims that appellate counsel rendered constitutionally deficient performance by failing to argue on appeal that the trial court erred by admitting certain evidence over hearsay objections (Sub-Claims 1-J, 1-K, and 1-A);

---

[6](...continued)
prosecutor's statement during closing argument that "Angels do not bear witness to plots hatched in Hell."  (Doc. No. 1 at 9-10).

[7]This sub-claim also sets forth an additional six sub-claims in that Petitioner points to six different instances where he contends the trial court erred in admitting hearsay testimony over the objection of his counsel.  (Doc. No. 1 at 11-12).

E.      The claim related to witness Albert Bass (Claim Two);

F.      The claim that trial counsel inadequately impeached certain state witnesses (Sub-Claims 6-B and 6-E);

G.      The claim that appellate counsel failed to argue on appeal that the trial court improperly admitted "bad act" evidence without a *Richardson* hearing (Sub-Claim 1-H);

H.      Claims related to the requested "independent act" jury instruction (Sub-Claims 1-D and 1-G);

I.      Claims related to the prosecutor's alleged improper remarks during his opening statement and closing arguments (Claim Seven, Sub-Claim 6-C, and Sub-Claims 1-C, 1-E and 1-I);

J.      The claim that appellate counsel failed to raise a "cumulative error" argument on direct appeal (Sub-Claim 1-L);

K.      The claim that the trial court lacked jurisdiction to impose Petitioner's sentence (Claim Nine);

L.      The claim that the trial court erred in allegedly permitting the State to alter and amend the Indictment (Claim Ten);

M.      The claim that Petitioner's rights were violated by the state courts' alleged failure to issue written opinions denying his motions for postconviction relief (Claim Eight).

## II.    THE LEGAL STANDARDS

### A.    Ineffective Assistance of Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy

. . . the Assistance of Counsel for his defence."   U.S. CONST. Amend. VI.   To satisfy this

constitutional command an accused must receive assistance at trial from "an attorney, whether

retained or appointed, who plays the role necessary to ensure that the trial is fair."   *Strickland v.*

*Washington*, 466 U.S. 66, 685 (1984).   Accordingly, "[t]he benchmark for judging any claim of

ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

In *Strickland*, the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance at trial or on direct appeal: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[8] *Id.* at 687-88; *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991) (applying *Strickland* test to claims that appellate counsel's performance was deficient). In applying *Strickland*, reviewing courts "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Rather, "[i]f it is easier," courts should "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Id.* (advising courts to "strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result"). Finally, because the "components of the ineffectiveness inquiry are mixed questions of law and fact, . . . a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." *Id.* at 698. Nonetheless, "state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d)." *Id.*

---

[8]The Court will refer to claims alleging deficient performance of trial counsel as "IAC" claims, and claims alleging deficient performance of appellate counsel will be referred to as "IAAC" claims.

1.      **The Prejudice Inquiry**

In order to satisfy *Strickland*'s prejudice prong, it is not enough to show that the counsel's conduct "had some conceivable effect on the outcome of the proceeding" because "[v]irtually every act or omission of counsel would meet that test." *Strickland*, 466 U.S. at 693.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

2.      **The Performance Inquiry**

The *Strickland* Court defined the "proper measure of attorney performance [as] simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  In applying this objective standard, "judicial scrutiny must be highly deferential." *Id.* at 689.  Accordingly, the defendant must overcome the strong "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689-90.  To render constitutionally effective assistance, appellate counsel need not raise issues that he (or she) reasonably concludes will not be considered on the merits by the appellate court. *Francois v. Wainwright*, 741 F.2d 1275, 1285 (11th Cir. 1984); *see also*, *Miller v. Dugger*, 858 F.2d 1536, 1538 (11th Cir. 1988) (indicating that courts must examine the merits of the argument petitioner alleges his counsel failed to raise to determine if appellate counsel acted reasonably).  Likewise, appellate counsel need not brief issues reasonably considered to be without merit. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984). Appellate counsel must be allowed to exercise reasonable professional judgment in selecting those issues most promising for review. *Jones v. Barnes*, 463 U.S. 745, 753 (1983).

11

**B.     The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA")**

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C.

§ 2254, as amended by the AEDPA.  *Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA

"establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261

F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that

state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S.

685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

**1.     Exhaustion and Procedural Default**

One procedural requirement set forth in the AEDPA precludes federal courts, absent

exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means

of available relief under state law.  28 U.S.C. § 2254(b);  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-

22 (1999).  The AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted unless it appears that–
>
> (A)     the applicant has exhausted the remedies available in the courts of the
>         State; or
>
> (B)     (I)     there is an absence of available State corrective process; or
>
>         (ii)    circumstances exist that render such process ineffective to
>                 protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  Thus, a federal court must dismiss those claims or portions of claims that

have been denied on adequate and independent procedural grounds under state law.  *Coleman v.*

*Thompson*, 501 U.S. 722, 750 (1991).  In addition, a federal habeas court is precluded from

considering claims that are not exhausted but that would clearly be barred if returned to state court. *Id*. at 735 n.1.

In order to satisfy the exhaustion requirement, a petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). The Supreme Court of the United States has observed that "Congress surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992). The Court further explained:

> [c]omity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claims on the merits.

*Id*.; *see also Henderson v. Campbell*, 353 F.3d 880, 898 n.25 (11th Cir. 2003) ("Both the legal theory and the facts on which the federal claim rests must be substantially the same for it to be the substantial equivalent of the properly exhausted claim.").

Procedural default will be excused only in two narrow circumstances. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice. To establish actual prejudice, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different had the claim been presented. *Henderson*, 353 F.3d at 892 (citations omitted). To establish cause, "a petitioner must

13

demonstrate that some objective factor external to the defense impeded [his] effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). The ineffective assistance of trial or appellate counsel may support a finding of cause only if counsel's performance was "so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). But if a petitioner "cannot prevail on a separate ineffective assistance of counsel claim, then he cannot prevail on an argument that ineffective assistance caused the procedural default." *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (holding that  cause for a procedural default will not be found if the petitioner fails to satisfy the two elements of the *Strickland* analysis). In addition, the petitioner must have presented an IAC or IAAC claim "to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 489 (1986).

The second exception, known as the "fundamental miscarriage of justice" exception  occurs only in the extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). "'To be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense in light of the new evidence. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

### 2.    Claims Based Upon Evidentiary Rulings or State Law

Pursuant to 28 U.S.C. § 2254, a state prisoner is entitled to federal habeas corpus relief only if he is held in custody in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a).  A federal court may not issue a writ of habeas corpus disturbing a state-court judgment "on the basis of a perceived error of state law."  *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (citation omitted).  Further, a mere error of state law does not constitute a denial of due process. *Estelle v. McGuire*, 502 U.S. 62, 67-69 (1991).

Additionally, federal "habeas corpus relief based on evidentiary rulings will not be granted unless it goes to the fundamental fairness of the trial."  *McCoy v. Newsome*, 953 F.2d 1252, 1265 (11th Cir. 1992);  *see also Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991) ("We review questions of state law in federal habeas proceedings only to determine whether the alleged errors were so critical or important to the outcome of the trial to render 'the entire trial fundamentally unfair.'").  The state trial error must have been "material in the sense of a crucial, critical, highly significant factor."  *Tejada*, 941 F.2d at 1560 (quotation omitted) (citations omitted); *see also Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983) (generally, a federal court will not review a state trial judge's ruling with respect to the admissibility of evidence); *Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 494 (1st Cir. 1989) (noting that "garden variety evidentiary rulings" should not be reviewed).

### 3.    Standard of Review

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)      resulted in a decision that was contrary to, or involved an unreasonable

> application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law," encompasses only the holdings of the Supreme Court of the United States "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state-court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider."  *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).  The meaning of these clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court of the United States] on a question of law or if the state court decides a case differently than [the Supreme Court of the United States] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court of the United States's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

It is insufficient for the federal court to conclude that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under section 2254(d)(2), a federal court may grant a writ of habeas corpus if the state-court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  A determination of a factual issue made by a state court, however, will be presumed correct, and the habeas petitioner has the burden of rebutting the

presumption of correctness by clear and convincing evidence.  *See Parker*, 244 F.3d at 835-36; 28

U.S.C. § 2254(e)(1).

### III.   MERITS OF THE PETITION

#### A.   The Trial Transcript (Claim Four and Sub-Claims 1-A and 1-F)

Petitioner claims that he was denied due process of law "because a complete and accurate

transcript" of his trial is not available, (Claim Four), and further claims that his appellate counsel

rendered ineffective assistance in failing to bring the "abysmal" condition of the trial transcript to

the attention of the appellate court (Sub-Claim 1-A).[9]  (Doc. No. 1 at 6-8, 10 & 14).  Petitioner raised

the due process claim in the Rule 3.850 proceeding, and the state trial court denied it as

"procedurally barred."[10]   (App. F. at 3).  Petitioner raised the IAAC claims in his state petition for

writ of habeas corpus, and the state appellate court denied the claims without a written opinion.

(App. E).

The absence of recorded bench conferences does not constitute constitutional deprivation

unless it renders appellate and post-conviction review impossible.  *See In re Shriner*, 735 F.2d 1236,

1241 (11th Cir. 1984) (holding that habeas petitioner's claim that bench conferences were not

recorded was "meritless").  Further, to prevail on a claim concerning an incomplete transcript, a

petitioner must establish that he suffered "actual prejudice" due to the transcription errors.  *See*

---

[9]Many of Petitioner's transcript error claims involve portions of the transcript relevant to other claims.  Where appropriate, the claims are addressed together.  *See infra* Part III.B (addressing claims related to Jackson), and Part III.C (addressing claims related to out of court statements by Bass) .

[10]The Court notes that the state court judge that denied Petitioner's claim regarding the incomplete transcript was the same state court judge who presided over Petitioner's trial, and hence, had an independent recollection of what occurred during the missing portions of the transcript.

*Songer v. Wainwright*, 733 F.2d 788, 792 (11th Cir.) (holding that "the lack of a transcript" of the charge conference in a death penalty case did not warrant issuance of a writ where petitioner "failed to demonstrate that the lack of a transcript" precluded review or that he was actually prejudiced by the absence of the transcript), *vacated*, 758 F.2d 552 (11th Cir. 1984), *reinstated*, 769 F.2d 1497 (11th Cir. 1985).  *See generally*, Kimberly C. Simmons, J.D., *Failure or Refusal of State Court Judge to Have Record Made of Bench Conference with Counsel in Criminal Proceeding*, 31 A.L.R. 5th 704 (1995).

Respondents do not allege, nor could they, that the transcript of Petitioner's trial is without error.  Nonetheless, Respondents argue that Plaintiff is not entitled to a writ because his due process claim is procedurally barred and his IAAC claims lack merit because, in the majority of the citations, "the nature of the objection or sidebar conference and/or the trial court's ruling is clear from the surrounding text" and he has suffered no prejudice.  (Doc. No. 15 at 30).  As explained below, with one exception, a review of the record reveals that Respondents are correct.[11]

At the beginning of the trial, the court explained in some detail that a digital audio recording would be made of the trial instead of having a stenographer make a record.  (App. A at 22-23).  Further, Petitioner's counsel was informed by the trial court that a stenographer may be needed to record the side-bar conferences:

| The Court: | . . . I'm going to take the break.  The Court Administration is going to check to see that we're recording side-bars. |
| Ms. Munyon: | Oh, okay. |

---

[11]It is inexcusable, particularly in a first degree murder case, to have a transcript this deficient. Under different circumstances, this failure to adequately record the trial proceedings could rise to the level of a constitutional deprivation.

18

| The Court: | If we can't record them, we're going to have to get a stenographer. And if we can, we'll continue with the system. |
|---|---|
| Ms. Munyon: | Okay. |

*Id.* at 254. Thus, it appears that Petitioner's counsel could have raised the transcription issue at trial or on direct appeal. Accordingly, this Court is bound by the state courts' explicit finding that Petitioner's due process claim (Claim Four) is procedurally barred. Petitioner has not shown that the state courts' application of the procedural bar was arbitrary. *See Hardwick v. Dugger*, 648 So. 2d 100, 105 (Fla. 1994) (rejecting incomplete transcript claim based upon procedural bar). Nor has he established that either exception to the procedural bar applies. As explained below, with two exceptions, Petitioner's IAAC claim is without merit because the missing portions of the trial transcript did not preclude review, and Petitioner has not established that he suffered prejudice. *See infra* Parts III.B and III.C (reserving ruling on certain claims pending further briefing).

### 1.    Page 352 of the Trial Transcript (Admission of Amy Braccio's Photograph)

Petitioner first points to a sidebar that ensued after the State attempted to admit a photograph into evidence that Bass identified as being of Amy Braccio. (Doc. No. 1 at 7 (citing page 352 of the trial transcript)). Petitioner's counsel, Ms. Munyon, asked if the attorneys could approach, and the following was transcribed:

| Ms. Munyon: | I object to the identity of the body in this case. (**Indiscernible Words**) photograph at this point. We stipulated to (**Indiscernible Words**). |
|---|---|
| The Court: | . . . How does your stipulation preclude . . . the admission of this? |
| Mr. LaFay: | The one stipulation that I have is this, that the body examined by Dr. Hair is the body of Amy Braccio. And that tissue samples analyzed originated from that autopsy. |

19

| The Court: | Has David Green IDd the photographs of the body of Amy Braccio during the autopsy?  That wouldn't preclude . . . |
| --- | --- |
| Ms. Munyon: | Yes. |
| The Court: | The other stipulation is that they agreed not to introduce any characteristics of the body that (**Indiscernible Words**).  Do you believe that your stipulations have precluded this photo? |
| Ms. Munyon: | **(Indiscernible Words).** |
| The Court: | Okay.  All right.  I don't think so. |

(App. A at 352 (emphasis added)).  After this exchange, the photograph of Amy Braccio was admitted into evidence.  *Id.*

As a preliminary matter, the Court finds that appellate review was not precluded in this case just because portions of Petitioner's counsel's objection is indiscernible.  It is clear that Petitioner's objection to admission of the photograph was based on the parties' stipulation, and the trial court overruled the objection.  Further, Petitioner makes no argument that the photograph of Amy Braccio was improperly admitted into evidence or that he was prejudiced by the jury's consideration of the photograph.  There is no suggestion that the photograph was inflammatory or otherwise improper.  Because admission of the victim's photograph provided no basis for appeal, appellate counsel did not render ineffective assistance in failing to bring the transcription error in this portion of the record to the attention of the appellate court.  *See Peede v. State*, 955 So. 2d 480, 502 n.6 (Fla. 2007) (rejecting claim that appeal was prejudiced due to unreported proceedings related to admission of nude photographs of victim where photograph was properly admitted into evidence).

**2.      Page 629 of the Trial Transcript (Admission of a Certified Copy of Petitioner's Driver's License)**

20

Petitioner complains that the transcript "does not record" his counsel's "legal objection" at page 629 of the trial transcript.  (Doc. No. 1 at 7).  It is clear from the record surrounding the complained of portion of the transcript that the issue before the trial court was whether a "certified copy" of Petitioner's driver's license should be admitted into evidence.  (App. A at 628-29).  The trial court asked Petitioner's counsel if she objected, and her answer was transcribed as follows: "Your Honor, I believe we began discussing this during opening statement.  I would object to this.  He's already gotten in, through Albie Bass, the defendant is over 18 years of age.  I believe, the only interest of introducing this is for the birth date.  They kept a **(Indiscernible Word)** picture **(Indiscernible Words)**."  *Id.* at 629 (emphasis added).  The trial court admitted the driver's license over counsel's objection.

As with the photo of Amy Braccio, Petitioner makes no argument that he was prejudiced in any way by the jury's consideration of the certified copy of his driver's license.  He does not argue that such evidence was inflammatory or otherwise improper.  Accordingly, Petitioner has not shown that appellate counsel rendered ineffective assistance in failing to bring the transcription error in this portion of the record to the attention of the appellate court.  *See Peede*, 955 So. 2d at 502 n.6.

**3.      Pages 703, 707 and 717 of the Trial Transcript (Testimony of Robert Cockrell)**

Petitioner's fifth, sixth and seventh transcription complaints deal with several indiscernible sidebar conferences that occurred during the testimony of Cockrell.[12]  (Doc. No. 1 at 7 (citing to pages 703, 707 and 717 of the trial transcript).  Cockrell was a nine-time felon who became acquainted with Bass and Petitioner while all three were incarcerated in Tennessee together after

---

[12]A fourth indiscernible sidebar conference during the testimony of Cockrell is addressed *infra*.  *See* Part III.C.

Amy Braccio's murder.  Cockrell testified that while he and Petitioner were cell mates in isolation for a month, Petitioner admitted his involvement in Amy Braccio's death and further plotted to kill Bass.  Petitioner's trial counsel made repeated objections to such testimony that are not completely memorialized in the transcript.

The State asked Cockrell about conversations he had with Petitioner regarding "a killing in Florida,"and Petitioner's counsel asked for a "standing objection based upon that previous objection for the truth," and the trial judge ruled that she could have the standing objection "for the reasons stated." *Id.* at 702.

After Petitioner's counsel made her standing objection, the State elicited testimony from Cockrell that Petitioner told him about killing a girl who stayed at a house he rented in Florida who was going to "snitch." *Id.* at 702-03.  The State asked what Petitioner's "tone" was, and Petitioner's counsel objected based upon "relevance." *Id.* at 703.  The trial court sustained the objection, and the State asked to approach. *Id.*  The transcript then provides "WHEREUPON: **There was an indiscernible side-bar conference** . . . ." *Id.* (emphasis added).  After the indiscernible side-bar conference, the State asked how Petitioner "appeared" to Cockrell while discussing Amy Braccio's murder, and Cockrell testified that it appeared Petitioner was "bragging." *Id.*

Cockrell then testified that Petitioner told him he accused Amy Braccio of being a snitch, and she denied that she was a snitch, but admitted to being in a room at the police station. *Id.* at 703-04.  According to Cockrell, Petitioner told him that was all he needed to hear, and further described to him a conversation Petitioner had with Bass when Petitioner rejected the suggestion of shooting Amy Braccio and told Bass they would "give her an overdose" of heroin instead. *Id.* at 704.  Cockrell further testified that Petitioner provided him with numerous details regarding the murder, including:

(1) Bass got the heroin from someone named Brooks; (2) Bass got the needles from his brother; (3) Bass and Villacana injected Amy Braccio with the heroin; (4) they wrapped her body in a sheet, transported her in the trunk of a Mazda "Mazarada," cut her hands and head off to avoid identification, and dumped her in "some woods;" (5) Amy Braccio's head and hands were put in a garbage bag, and (6) "Bruce" got rid of all of Amy Braccio's possessions. *Id.* at 706-07.

After eliciting the foregoing testimony, the State again asked to approach, and the transcript provides that "**There was an indiscernible side-bar conference.**" *Id.* at 707. The State then asked Cockrell a series of questions regarding Petitioner's reaction to Bass testifying against him regarding Amy Braccio's murder. *Id.* at 707-08. Petitioner's counsel objected as follows: "Your Honor, at this point, I would object. And I believe we've argued this point previously. I would object on these grounds." *Id.* at 708. The trial court overruled the objection "for the reasons stated earlier." *Id.* The State then elicited testimony from Cockrell that Petitioner wanted Bass killed and requested assistance from Cockrell to poison Bass in jail. *Id.*

During cross-examination, Petitioner's counsel asked Cockrell whether Petitioner told him he had ordered that Amy Braccio be decapitated and her hands taken off, and Cockrell answered that Petitioner had not told him that. *Id.* at 716. The State then interrupted and asked if he could approach the bench. *Id.* at 717. The transcript provides that "**There was an indiscernible side-bar conference**." *Id.* After this side-bar conference, Petitioner's counsel questioned Cockrell about his dealings with Bass at the prison. *Id.*

The foregoing does not provide a complete picture of the proceedings during Cockrell's testimony; however, the transcript is not so deficient as to preclude appellate review of the presentation of the foregoing portions of Cockrell's testimony. Furthermore, Petitioner has

23

suggested no basis upon which Cockrell's testimony regarding Petitioner's incriminating statements and the manner in which he delivered them could have been excluded.  Accordingly, Petitioner has failed to establish that he suffered prejudice, and the Court cannot find that the state courts erred in rejecting Petitioner's claim that his appellate counsel should have brought these omissions in the transcript to the attention of the appellate court.  *See Turner v. Dugger*, 614 So. 2d 1075, 1079-80 (Fla. 1992) (holding that "the fact that bench conferences were not reported did not prejudice" appeal).

### 4.  Pages 722 and 723 of the Trial Transcript (Testimony of Detective Raker)

Petitioner asserts two transcription complaints concerning an indiscernible statement by the trial judge and an indiscernible side-bar conference during the testimony of Detective Raker.  (Doc. No. 1 at 8).  Detective Raker testified regarding his interviews of all of the prisoners incarcerated in the same cell block with Bass and Petitioner in Tennessee – particularly his interview with Cockrell. (App. A at 721-25).  During Detective Raker's testimony, Petitioner's counsel objected that one question had been "asked and answered," *id.* at 722, and objected to another question based upon hearsay, *id.* at 723.  After the first objection, an "indiscernible" statement is made by the trial judge, and the State asked a different question.  *Id.* at 722.  After the second objection, the State asked Detective Raker the same question that had drawn an objection, and the witness was permitted to respond.  *Id.* at 723.  Petitioner has not shown that appellate review was hampered due to these minor omissions in the transcript.[13]  Further, as explained *infra*, the hearsay objection did not provide a viable issue for appeal.  *See infra*, Part III.D.5.  Petitioner has suggested no other grounds to exclude

---

[13]Petitioner submitted handwritten notes of his trial counsel which confirm that the indiscernible portion of the record simply provided an explanation of her hearsay objection.  (Doc. No. 1, Appendix B, Exhibit 1).

Detective Raker's testimony.  Accordingly, Petitioner cannot prevail on his claim that appellate counsel rendered ineffective assistance by not bringing these omissions in the transcript to the attention of the appellate court.

5. **Page 737 of the Trial Transcript (Testimony of Sharon Dees)**

Petitioner points to an error during the testimony of Sharon Dees.  (Doc. No. 1 at 8 (citing trial transcript at page 737)).  Sharon Dees testified that she overheard a conversation between Villacana and Petitioner that was transmitted over a surveillance system.  (App. A at 736-37).  Specifically, Sharon Dees stated: "At first I – you know, I heard voices, . . . and I still kept playing with my computer but I heard – Tony said, I gave them – I gave her enough to put out a horse." *Id.* at 737.  Petitioner's counsel objected, and the trial judge asked: "What was the legal objection?" *Id.*  The transcript then provides as follows: "Hearsay.  I believe the State's response **(Indiscernible Words)**." *Id.* (emphasis added).  The trial judge overruled the objection.  The Court finds that, despite the omission of a portion of the objection, the legal basis of her objection and the trial court's ruling are clear, and any argument on appeal that this omission from the transcript violated Petitioner's rights would be frivolous.  Accordingly, Petitioner's claim that his appellate counsel rendered ineffective assistance is without merit.

6. **Pages 772-73 of the Trial Transcript (Jury Sequestration)**

Petitioner next identifies an indiscernible side-bar conference that occurred while the trial judge was addressing the jury regarding their impending deliberations.  (Doc. No. 1 at 8 (citing to pages 772-73 of the trial transcript)).  After explaining to the jurors that they would hear closing arguments the next morning, would be instructed on the law and then deliberate, the trial judge stated, "I need to talk to the attorneys about one issue and then I can give you some advice on another

25

matter." (App. A at 772). The transcript indicates that after this statement, "**There was an indiscernible side-bar conference.**" *Id.* at 773 (emphasis added). Following the indiscernible side-bar conference, the trial judge informed the jury:

> Okay. Folks, I had mentioned to you a few days ago that it might be that when you are given the verdict to deliberate that if it became necessary you would have to be sequestered. That's not correct. I was incorrect about that so that's not an issue. And I just mentioned it because if it were an issue, I'd tell you, you know, pack a bag and bring it with you, but it's not an issue.

*Id.*

The Court notes that the sequestration issue had been raised previously in the trial, but was never completely resolved. Further, it is evident from the proceedings that the complained of omission from the transcript dealt with the sequestration issue. Because the surrounding context reveals the substance of this side-bar conference, the Court cannot find that the absence of a record of this side-bar conference hampered appellate review. Neither the sequestration issue nor the related transcription error provided grounds for appeal; thus, appellate counsel was not deficient in failing to raise such issues on appeal.

### 7.    Pages 828 and 839 of the Trial Transcript (The State's Closing Argument)

Petitioner's fourteenth and fifteenth transcription complaints concern indiscernible sidebar conferences during the State's closing argument. (Doc. No. 1 at 8 (citing page 828 of the trial transcript). The first transcription error appears at page 828 of the transcript after the prosecutor states: "Now, there's an old saying, and it applies to this case. And there is no doubt what I'm going to tell you applies to this case. And the saying is. Angels do not bear witness to plots hatched in hell. They don't." (App. A at 828). Petitioner's counsel immediately objected and asked to approach. *Id.* The trial judge permitted the parties to approach, and the transcript reveals that

"**There was an indiscernible side-bar conference**."[14]  *Id.* (emphasis added).  After the indiscernible side-bar conference, the prosecutor continued with his closing argument as follows: "And their testimony, it all fits. . . ."  *Id.*

The second transcription error occurred at page 839 of the transcript, after the prosecutor argued that Petitioner lied to Amy Braccio's mother regarding her whereabouts after she was murdered, and that the "Defense, when they come back up," might have an answer regarding why he would "tell such a lie."  (App. A at 838-39).  Petitioner's counsel objected and asked to approach. *Id.* at 839.  The transcript then provides that "**There was an indiscernible side-bar conference**," after which the trial court instructed the jury: "Ladies and gentlemen, that State of Florida bears the only burden of proof in this case.

The defendant is not required to prove anything, and I'd ask you to disregard the Prosecutor's last comment."[15]  *Id.*

The Court finds that the transcription error after counsel's objection to the prosecutor's "plots hatched in hell" comment posed no obstacle to appellate review.  Based on the record, appellate counsel could have argued, if appropriate, that this comment was improper, and an appellate court would have no difficulty in assessing such a claim.  However, as noted *infra*, courts routinely reject claims of prosecutorial misconduct based upon statements almost identical to those here.  *See infra*,

---

[14]According to Petitioner, notes from his trial counsel indicate that during this indiscernible side-bar conference, she "may have requested a mistrial" because the State had dehumanized Petitioner by referring to plots hatched in hell.  (Doc. No. 1, Appendix B, Exhibit 1).

[15]According to Petitioner, notes from his trial counsel indicate that during this indiscernible side bar conference, she "objected to State shifting the burden of proof and commenting on the right to remain silent" and she asked for a mistrial, which was denied, but a curative instruction was given. (Doc. No. 1, Appendix B, Exhibit 1).

Part III.I.3 (rejecting claim that appellate counsel should have argued that the prosecutor's "plots hatched in hell" statement was improper).  Because neither the prosecutorial misconduct issue nor the related transcription error provided grounds for appeal, Petitioner cannot prevail on his claim that appellate counsel was  deficient in failing to raise such issues on appeal.

The Court similarly finds that the transcription error after counsel objected to the prosecutor's argument that Petitioner lied and the Defense might "have an answer" posed no significant obstacle to appellate review.  Furthermore, given that the trial court obviously sustained Petitioner's counsel's objection and provided the jury with an appropriate curative instruction, Petitioner cannot establish that he suffered prejudice based upon appellate counsel's failure to bring the transcription error to the attention of the appellate court.  *See infra*, Part III.I.2 (rejecting Petitioner's claim that his appellate counsel should have argued that the prosecutor's comments were improper).  Accordingly, Petitioner cannot prevail on his claim that appellate counsel was  deficient in failing to raise such issues.

### 8.    Page 866 of the Trial Transcript (Jury Instructions)

For his final transcription complaint, Petitioner identifies an indiscernible side-bar conference that occurred at page 866 of the trial transcript.  (Doc. No. 1 at 8).  After instructing the jury, the trial court asked the attorneys to approach.  (App. A at 865-66).  The transcript then provides "**There was an indiscernible side-bar conference**."  *Id.* at 866 (emphasis added).  At the conclusion of the indiscernible side-bar conference, the trial court informs the jury that "there's a line that we may have dropped off one of the instructions, and so, I'm going to have my judicial assistant type it in there – or prepare it."  *Id.*  After a brief explanation, the jury retired to deliberate.  *Id.* at 866-67.

Respondents contend that it is clear from the transcript that the issue addressed during the

indiscernible side-bar was the line missing from the jury instructions. (Doc. No. 15 at 36 (arguing that "the subject of the bench conference is clear from the context")). Petitioner counters that a factual dispute exists because his trial counsel indicated that, during this indiscernible bench conference, the trial court asked if there were any objections to the jury instructions, and that she "revived her objections" to preserve them for appeal. (Doc. No. 1, Appendix B, Exhibit 1; Doc. No. 27 at 5).

Assuming that Petitioner is correct that his counsel revived her prior objections to the jury instructions during this indiscernible side-bar, Petitioner still cannot prevail because he cannot establish that he suffered prejudice. Importantly, Petitioner asserts only one claim related to his jury instructions – that the trial court erred in denying his request for an "independent act" instruction. *See* Doc. No. 1 at 10 (alleging that his appellate counsel rendered constitutionally deficient assistance by failing to argue on appeal that the trial court erred in denying Petitioner's request for an "independent act" jury instruction (Sub-Claim 1-G)). There are no transcription errors regarding trial counsel's request for an independent act instruction or her objections to the trial court's refusal to provide the instruction. (App A. at 784-85). Thus, the complained of omission did not hamper appellate review. Furthermore, as explained *infra*, the trial court did not err in denying Petitioner's claim for an independent act jury instruction. *See* Part III.H (rejecting Petitioner's claim that his appellate counsel was ineffective by failing to raise the independent act jury instruction issue on direct appeal). Accordingly, Petitioner cannot prevail on his claim that his appellate counsel was deficient in failing to raise this transcription error on direct appeal.

## B.      Errol Jackson (Claims Three and Five, and Sub-Claims 6-A, 6-D, 1-A, and 1-B)

Petitioner asserts at least six claims related to defense witness Jackson. According to

Petitioner, Jackson was going to provide favorable testimony, but did not do so because the prosecutor "threatened and intimidated" Jackson "with prosecution for conspiracy to commit murder if Jackson merely testified for the defense."  (Doc. No. 1 at 11-12).  At trial, Petitioner's counsel called Jackson as Petitioner's only witness, and after consultation with his own counsel, Jackson refused to answer any questions based upon the Fifth Amendment right against self-incrimination. After two indiscernible sidebar conferences, the trial court excused Jackson, and the defense rested.

Petitioner's claims related to Jackson are that:  (1) the prosecutor interfered with a defense witness by threatening Jackson,[16] (Claim Three);  (2) an IAC claim based upon counsel failing to preserve the witness interference claim (Sub-Claim 6-D);  (3) the trial court erred in permitting Jackson to assert a "blanket" right not to testify (Claim Five);  (4) an IAC claim based upon counsel failing to object to the trial court's actions (Sub-Claim 6-A);  (5) an IAAC claim based upon counsel failing to argue trial court error on direct appeal (Sub-Claim 1-B); and (6) an IAAC claim based upon counsel failing to bring two transcription errors to the appellate court's attention (Sub-Claim 1-A). (Doc. No. 1 at 8, (citing trial transcript at pages 763 and  769), *id.* at 9 and 15).

Petitioner raised his IAAC claims in his state petition for writ of habeas corpus, and the state appellate court rejected the claims without a written opinion.  (App. E).  Petitioner raised the remaining claims of trial court error, interference with a defense witness, and both IAC claims in the Rule 3.850 proceeding, and the trial court rejected the claims as "procedurally barred."  (App. F at

---

[16] In his memorandum in support of the petition, Petitioner further contends that the prosecutor withheld "from the defense the information contained in the deposition given by [Errol] Jackson, who, after being threatened by the prosecutor improperly sought refuge in the Fifth Amendment."  (Doc. No. 11 at 17).  According to Petitioner, the prosecutor was "presented with a tape of [Errol] Jackson's testimony during trial . . . and was required to release it to the defense." *Id.*  Petitioner has not supported these allegations with a deposition transcript or any other evidence of the purported deposition.

3-5).  The state trial court held that the claims of interfering with a defense witness and trial court error "could have been and should have been raised on direct appeal."  *Id.* at 3-4.  The state trial court further held that Petitioner's IAC claims were "an impermissible attempt to raise a procedurally barred issue by rephrasing it in terms of ineffective assistance of counsel."  *Id.* at 5.  Finally, the state trial court held that the IAC claim that counsel did not object to trial court error lacked merit because there "was nothing more that [Petitioner's] counsel could have done, since she was not permitted to interfere with Jackson's Fifth Amendment privilege against self-incrimination."  *Id.* at 4.  The state trial court's rejection of these claims was affirmed *per curiam*.

The state trial court's explicit finding that Petitioner's IAC, trial court error and witness interference claims are procedurally barred precludes this Court's review of the claims absent a showing that one of the two exceptions to procedural bar apply.  Here, it appears that Petitioner is attempting to establish cause and prejudice by asserting an IAAC claim that counsel was ineffective in failing to raise the issue of the trial court's alleged error in allowing Jackson to assert a "blanket" right not to testify.  Petitioner has not attempted to establish that either of the two procedural bar exceptions excuse the default of his remaining claims of witness interference and IAC.  Accordingly, this Court cannot entertain those claims.  The Court will address Petitioner's remaining IAAC claims which involve the invocation of the Fifth Amendment right against self-incrimination, and the Sixth Amendment right to present a defense.

Under clearly established law, criminal defendants have a fundamental due process right to "present a defense" by offering "the testimony of witnesses, and to compel their attendance, if necessary."  *See Washington v. Texas*, 388 U.S. 14, 23 (1967).  A trial court deprives the defendant of this right when its improper remarks induce a defense witness to assert his Fifth Amendment right

not to testify. *Webb v. Texas*, 409 U.S. 95, 99 (1972). Some federal courts have held that a criminal defendant also is deprived of his due process rights when a prosecutor's actions improperly interfere "with the intelligent determination of the witness as to his Fifth Amendment rights." *United States v. Valdes*, 545 F. 957, 960 (5th Cir. 1977) (citing *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973)).[17]  A witness interference claim based only on the defendant's "bare assertion" that a witness's testimony would be favorable should be rejected as speculative. *Id.* at 961. Further, a witness interference claim may fail when the decision not to testify was made "after consultation with [the witness's] own counsel." *Id.* at 960.

Absent proof of misconduct, "the Government cannot be penalized . . . under the Compulsory Process Clause of the Sixth Amendment" because a witness favorable to the defense exercises his Fifth Amendment rights. *United States v. Gomez-Rojas*, 507 F.2d 1213, 1220 (5th Cir. 1975). Nonetheless, a trial court should make a determination that a witness's invocation of the privilege is well-founded, and "if it clearly appears to the court [that the witness] is mistaken" in invoking the privilege, then the court must require the witness to answer. *Hoffman v. United States*, 341 U.S. 479, 486-487 (1951); *Gomez-Rojas*, 507 F.2d at 1220 (reversing conviction for drug trafficking because the trial court erred in excusing a police informant witness based upon his "bald assurance that he ha[d] a proper Fifth Amendment right to refuse to answer" questions that were "critical" to defendant's entrapment defense).[18]

---

[17]Fifth Circuit cases "handed down . . . prior to the close of business" on September 30, 1981, are binding precedent on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)(en banc).

[18]The *Gomez-Rojas* Court ordered the trial court to hold an evidentiary hearing on remand "to determine whether [the witness's] fear of self-incrimination is well-founded and what the
(continued...)

A "custom" exists for assessing the propriety of a Fifth Amendment privilege claim;[19] however, the United States Supreme Court has held that "it need only be evident from the implications of the question, in the setting in which it was asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 486-87 (explaining that "a trial judge's appraisal of a claim of privilege must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence). In any case, trial courts "enjoy wide discretion in resolving a self-incrimination claim." *United States v. Van Deveer*, 577 F.2d 1016, 1017 (5th Cir. 1971) (holding that a "particularized inquiry and articulation of reasons for sustaining the validity" of the privilege was essential where trial judge was familiar with facts of case which "presented a strong setting for validating a self-incrimination claim").

Here, Petitioner's assertions that Jackson was going to testify that he "heard Tony Villacana (the person at trial that admitted having killed Amy Braccio, the victim) state to Errol Jackson (and others at the jail) that [Petitioner] was not involved in the death of Amy Braccio," and that the

---

[18](...continued)
parameters of his Fifth Amendment rights are in the context of the testimony that [the defendant] wishes to obtain from him." *Gomez-Rojas*, 507 F.2d at 1220.

[19]According to the *Gomez-Rojas* Court, the "custom" to be employed when a witness invokes his Fifth Amendment right:

> is for the trial judge to examine the protesting witness out of the presence of the jury in order to determine the validity of his claim. Once the court satisfies itself that the claim is well-grounded as to the testimony desired, it may, in its discretion, decline to permit either party to place the witness on the stand for the purpose of eliciting a claim of privilege or to comment on this circumstance.

*Gomez-Rojas*, 507 F.2d at 1220 (citing *United States v. Lacouture*, 495 F.2d 1237 (5th Cir. 1974)).

prosecutor threatened Jackson with prosecution and the death penalty are based upon pure speculation. *See* Doc. No. 11 at 3. There is no evidence that the prosecutor threatened Jackson in any way; accordingly, even if Petitioner's witness interference claims were not procedurally barred, they would be denied on the merits. Petitioner's contention that Jackson would have provided favorable testimony also appears to be speculative. Absent proper support in the record, the Court would normally find that Petitioner cannot prevail on his claims related to Jackson's testimony and his invocation of the Fifth Amendment privilege; however, resolution of these issues is complicated by omissions in the trial transcript.

The transcript reveals that after Jackson was sworn, he asked to speak with his attorney, and the trial judge asked Petitioner's counsel to proffer the areas on which she intended to question Jackson. *Id.* at 762. Petitioner's counsel responded:

> Your Honor, I have never spoken with this witness because he's represented by Counsel and [I] did not have permission to do so. It is my understanding that he did share a cell with Mr. Villacana , or at least a pod. And that Mr. Villacana did in fact tell him some things with regard to this incident. And that Mr. Villacana might have . . .

*Id.* The State then requested that the proffer not occur in the presence of the witness, and the trial judge asked the attorneys to approach. *Id.* At that point the transcript provides that "**There was an indiscernible side-bar conference**." *Id.* at 763 (emphasis added).

Following the indiscernible side-bar conference, the trial judge explained to Jackson that neither the State nor the Court was extending immunity to him, and "there is an issue about whether you have the right to assert your Fifth Amendment privileges not to give testimony that could be used to prosecute you in this proceeding. And that's where we are and that's a decision you have to make." *Id.* at 763. Jackson then asked for additional time to consult with his counsel, and the trial

34

judge ordered that Jackson and his counsel be taken to a holding cell to talk privately.  *Id.* at 764.

When Jackson and his counsel returned to the court room, Petitioner's counsel attempted to question

him as follows:

| | |
|---|---|
| Ms. Munyon: | Mr. Jackson, are you currently housed in the Orange County Jail? |
| [Jackson's Counsel]: | Your Honor, at this time, Mr. Jackson will invoke his Fifth Amendment Right, self-incrimination if he's to answer any more questions.  Is that correct Mr. Jackson? |
| [Jackson]: | Yes. |
| The Court: | Ms. Munyon? |
| Ms. Munyon: | He refuses to answer any more questions at all? |
| [Jackson's Counsel]: | Any more questions. |
| Ms. Munyon: | I have nothing further, Your Honor, except to ask . . . may we approach? |
| The Court: | (No Verbal Response) |
| WHEREUPON: | **There was an indiscernible side-bar conference,** after which the proceedings were as follows: |
| The Court: | All right.  Thanks, Mr. Jackson.  The court deputies are going to take you back to the main jail. |

*Id.* at 769 (emphasis added).[20]

As to these obvious transcription errors, Respondents state that it is clear that the parties were

addressing Jackson's invocation of his Fifth Amendment right against self-incrimination during the

---

[20]Petitioner provided handwritten notes from his trial counsel indicating that, during the indiscernible side-bar conference at page 763, she "finished the proffer and began talking to the court about immunity" for Jackson at this portion of the transcript.  (Doc. No. 1, Appendix B, Exhibit 1). Petitioner provided no similar evidence regarding what occurred during the indiscernible side-bar noted at page 769 of the trial transcript.

sidebar at page 763.  (Doc. No. 15 at 34).  With regard to the indiscernible sidebar conference at page

768, Respondents argue:

> Since the State had made it clear that it would not grant Jackson immunity, and
> neither would the court, and Jackson invoked his right, it seems clear that this matter
> was settled.  Clearly, the sidebar would have had no impact and/or prejudice on any
> appellate claim which might have been raised.

*Id.*

The Court disagrees that the context of the indiscernible side-bar conferences clearly reveals

the substance of those proceedings.  Petitioner's proffer of Jackson's testimony occurred during the

first indiscernible sidebar, but the substance of that proffer is lost.  The subject of the second sidebar

simply cannot be discerned, and the Respondents' assertion that "the sidebar would have had no

impact and/or prejudice on any appellate claim which might have been raised" is too conclusory.

Given the timing of the sidebar, before the trial court excused Jackson, the Court cannot determine

whether an argument was made that might preserve a valid issue for appeal regarding Jackson.

Given the length of the petition and the fact that Petitioner asserted at least forty claims,

Respondents requested the opportunity to supplement its response if the Court "deems a further

response to any of the claims appropriate."  (Doc. No. 15, at 48).  The Court finds that a further

response to Petitioner's IAAC claims and the claim of trial court error is appropriate.  Accordingly,

the Court will reserve ruling on those claims pending further proceedings as ordered *infra*.  *See infra*

Part IV.

**C.**     **Cockrell's Testimony Relating Bass's Out of Court Statements**

Petitioner contends that his appellate counsel should have argued on appeal that the trial court

erred in overruling his trial counsel's hearsay objection regarding Bass's out of court statements as

36

related by Cockrell during his direct testimony.  (Doc. No. 1 at 12 (citing page 699 of the trial transcript)).  Petitioner further claims that appellate counsel was deficient in failing to bring a related indiscernible sidebar conference to the attention of the appellate court.  (Doc. No. 1 at 7 (citing to page 699 of the trial transcript)).   These claims were rejected by the state appellate court without a written opinion.

Petitioner points to an indiscernible sidebar conference that occurred shortly after the State asked Cockrell: "While [Petitioner] was over in J block, did you have a conversation with Bass about what you overheard?"  (App. A at 699).  Petitioner objected based upon hearsay, and the State responded:

> [I]t's not for the truth of the matter. . . . [I]t's important . . . to show what information [Cockrell] got from [Petitioner] and what he got from other sources. Obviously, it's important not to lay information that came out of [] Bass's mouth. [Cockrell's] going to say that Bass gave him a couple of facts about the murder and he didn't really talk much about it.  And then he's going to say what Bass told him. And I think that's important to show that that didn't come from [Petitioner].

*Id.*  In response, the trial court stated, "In effect, it's almost *Brady* material."  *Id.*  After this statement, the transcript provides:

WHEREUPON:   **There was an indiscernible side-bar conference.**

The Court:      All right.  Ladies and gentlemen, the statements that you're about to hear are not being offered for the truth of what they state but they're being admitted to establish who the speaker was, that is, who gave this witness the information.

\*      \*      \*

Mr. LaFay:      What did you ask [Bass]?

Cockrell:        Just asked him was it true what [Petitioner] had said about what went on down in Florida.

| Mr. LaFay: | And what did he say? |
|---|---|
| Cockrell: | He told me, yes, it was true. |
| Mr. LaFay: | Did he give you any details? |
| Cockrell: | Well, I asked him what had happened. . . . And he told me that they had took [sic] somebody out, you know, took a girl out. |
| Mr. LaFay: | Did he say how they killed her? |
| Cockrell: | No. . . . I asked him what they did with the body. |
| Mr. LaFay: | What did [Bass] say? |
| Cockrell: | He said he loaded her up in a trunk. |
| Mr. LaFay: | Did you press him anymore for details? |
| Cockrell: | No. |

(App. A at 700-01).

Given the testimony elicited from Cockrell and the trial court's limiting instruction to the jury, it appears that the trial court overruled the hearsay objection.  However, the trial court's reference to *Brady* material after Petitioner's objection and just prior to the indiscernible sidebar conference noted above greatly muddies the water on this issue.  In any case, the Court finds that the trial court erred in permitting Cockrell to testify to Bass's out of court statements regarding the murder of Amy Braccio because the statements were classic hearsay.  Given a complete transcript, effective appellate counsel should have raised the issue on appeal.

Respondents again argue that the transcription error is irrelevant because the context of the indiscernible side-bar conference clearly reveals the substance of the proceedings as a hearsay objection and ruling by the trial court that the statements were "not offered for the truth of the matter

asserted." (Doc. No. 15 at 32-33). As with the transcription errors related to Jackson, *supra* Part III.B, the Court finds that Respondents arguments are too conclusory and that a further response is appropriate. Accordingly, the Court will reserve ruling on the claims regarding Bass's out of court statements and the related transcription error pending further proceedings as ordered *infra*. *See infra* Part IV.

**D.      Admission of Hearsay Evidence (Sub-Claims 1-J, 1-K and 1-A)**

Petitioner claims that his appellate counsel rendered ineffective assistance in failing to "raise before the court of appeal the issue of the trial court erring in overruling" several of his trial counsel's hearsay objections. *See* Doc. No. 1 at 11-13 (citing to objections raised and testimony presented at App. A, 355, 374-76, 493, 495-96, 655 and 722-23). Petitioner raised these IAAC claims in his state petition for writ of habeas corpus, and the state appellate court denied the claims without a written opinion.

**1.      Page 355 of the Trial Transcript (Cathy Harrold's Out-of-Court Statement)**

The first objection identified by Petitioner was raised when the prosecutor asked Bass about a conversation he had on January 20, 1998, with Cathy Harrold "about a person by the name of Keith and Amy Braccio." (App. A at 355). Over Petitioner's objection, Bass testified that Cathy Harrold told him "Keith had gotten busted and that Amy went with him to see the cops and was supposedly telling on [Petitioner]." *Id.* at 363. While this is an out-of-court statement, it was not offered by the prosecution for its truth. Indeed, the prosecutor presented other evidence that Cathy Harrold's statement that Amy Braccio was cooperating with law enforcement was *not true*. *Id.* at 487-506. Thus, the trial court did not err in permitting Bass's testimony on this point, and appellate counsel was not ineffective in failing to argue this meritless claim on direct appeal.

39

Petitioner also complains that the "trial court is not memorialized as overruling or sustaining" his counsel's hearsay objection after the State asked Bass what Cathy Harrold said about Amy Braccio going to the police. (Doc. No. 1 at 7 (citing to page 355 of the trial transcript)). Because Cathy Harrold's out-of-court statements that Amy Braccio was a police informant were not hearsay, appellate counsel also did not render ineffective assistance in failing to bring any purported transcription error in this portion of the record to the attention of the appellate court.[21]

### 2.      Pages 374-76 of the Trial Transcript (Villacana's Out-of-Court Statement)

Petitioner contends that his counsel should have argued on appeal that the trial court erred in overruling his trial counsel's hearsay objection at page 375 of the trial transcript. (Doc. No. 1 at 11-12 (citing to pages 375-76 of the trial transcript)). There, Petitioner's trial counsel made a hearsay objection when the prosecutor asked Bass to describe a conversation he overheard between Petitioner and Villacana a few days after the murder of Amy Braccio. (App. A at 374-75). In response to the hearsay objection, the prosecutor argued that Villacana's statement to Petitioner that he cut Amy Braccio's "head and hands off and buried them somewhere" was a "[c]o-conspirator statement or . . . a statement by agent under the admission section." *Id.* at 375. Petitioner's counsel countered that the conspiracy was concluded at that point and "another interpretation" of the statement was "Villacana bragging to [Petitioner] about what he did." *Id.* The trial court overruled the objection, and Bass was permitted to testify that he heard Villacana tell Petitioner that "he cut

---

[21]A review of the record does not reveal a transcription error. Rather, it appears that the trial court did not explicitly overrule or sustain the objection because an issue arose regarding the health of one of the jurors. (App. A at 355-61). In any case, the trial judge made clear his ruling that he did not believe Bass's testimony regarding Cathy Harrold's out-of-court statement "is by definition [] hearsay." *Id.* at 357. Petitioner's counsel stated that it was difficult for her to find a "response to that." *Id.* Ultimately, Petitioner's counsel did not reassert her objection when Bass was asked "What did Cathy Harrold tell you?" *Id.* at 363.

Amy's head and hands off and buried them somewhere," and he left her body laying on "top of the ground." *Id.* at 375-76.

The Court finds that the issue of whether the state trial court erred in finding that the co-conspirator exception applied to Villacana's out-of-court statement could reasonably be considered to be without merit. Thus, Petitioner's counsel was not deficient in failing to raise the claim on direct appeal. *Alvord*, 725 F.2d at 1291. Petitioner also has not demonstrated that his appellate counsel's failure to raise this issue on appeal prejudiced his defense. The testimony to which Petitioner objects was duplicated by other witnesses at trial. For instance, Sharon Dees also testified that she overheard a conversation between Villacana and Petitioner regarding Villacana's disposal of Amy Braccio's body. Further, Villacana testified at Petitioner's trial and was subject to cross-examination. Because Petitioner cannot satisfy either prong of the *Strickland* analysis, the Court cannot find that the state appellate courts denial of this claim was objectively unreasonable.

### 3. Pages 493-96 of the Trial Transcript (Fatigate's Out-of-Court Statements)

Next, Petitioner argues that his counsel should have argued on appeal that the trial court erred in overruling his trial counsel's hearsay objection at pages 493-495 of the trial transcript. (Doc. No. 1 at 12 (citing pages 493-95 of the trial transcript)). There, the prosecutor asked Detective Callin a series of questions regarding statements made by Fatigate during a jailhouse interview on February 11, 1998. (App. A at 494-98). Petitioner's counsel requested a "standing objection" on hearsay grounds, and the trial judge overruled the objection upon finding that the evidence was admissible as "prior consistent" statements to rebut a charge of bias or improper motive. *Id.*

The Court finds that the issue of whether the trial court erred in finding that the prior consistent statement exception applied to Fatigate's out-of-court statements could reasonably be

considered to be without merit.  Thus, Petitioner's counsel was not deficient in failing to raise the issue on direct appeal.  *Alvord*, 725 F.2d at 1291.  Petitioner also has not demonstrated that his appellate counsel's failure to raise this issue on appeal  prejudiced his defense.  The testimony Petitioner objects to was duplicated by other witnesses at trial.  Fatigate, Bass, Villacana and others testified that Petitioner was a cocaine dealer, that he ordered Villacana to kill Amy Braccio with a heroin overdose, and that Petitioner ordered Villacana to dispose of her body with the assistance of Bass.  Further, Fatigate testified at Petitioner's trial and was subject to cross-examination. Accordingly, Petitioner cannot satisfy either prong of the *Strickland* analysis, and the Court finds that the state appellate court did not err in denying this claim.

> **4.**     **Page 655 of the Trial Transcript (Detective Raker's Out-of-Court Statement)**

Petitioner contends that his counsel should have argued on appeal that the trial court erred in overruling his trial counsel's hearsay objection at page 655 of the trial transcript.  (Doc. No. 1 at 12 (citing page 655 of the trial transcript)).  There, the victim's mother was permitted to testify that Detective Raker told her to look for a certain pair of the victim's shorts to assist in determining whether a body found in the Ocala National Forest was Amy Braccio.  (App. A at 655-56).  The trial court properly overruled the objection because the statement was not being offered for the truth of the matter asserted.  Accordingly, Petitioner cannot succeed on this IAAC claim.

> **5.**     **Page 722 of the Trial Transcript (Cockrell's Out-of-Court Statements)**

Petitioner's final hearsay-related sub-claim is that his counsel should have argued on appeal that the trial court erred in overruling his trial counsel's hearsay objection at page 722 of the trial transcript.  (Doc. No. 1 at 13 (citing page 722 of the trial transcript)).  There, Detective Raker was permitted to testify over a hearsay objection to statements Cockrell made to him during an interview

at the jail in Tennessee.  (App. A at 722-23).  Specifically, Detective Raker testified that during his initial interview, Cockrell told him that Petitioner admitted to having Amy Braccio killed because she was going to "snitch."  *Id.* at 723-24.

Although the prosecutor's response and the trial court's ruling do not appear in the transcript, the Court cannot find that Petitioner's appellate counsel erred in failing to argue that Detective Raker's testimony was erroneously admitted into evidence.  Just as testimony regarding Fatigate's jailhouse interview was admissible as "prior consistent" statements to rebut a charge of bias or improper motive, statement's made during Cockrell's jailhouse interview also was admissible.  During cross-examination, Petitioner's counsel effectively highlighted the "improper" motive Cockrell possessed for testifying against Petitioner.  To rebut this challenge, the prosecutor recalled Detective Raker to testify immediately after Cockrell was impeached.  Further, to the extent the hearsay objection was related to Petitioner's out-of-court statements regarding his involvement in Amy Braccio's murder, such statements are clearly admissible as a statement against interest.  Finally, the Court notes again that no prejudice can be established because the testimony at issue was repeated by several witnesses, and Cockrell was subject to cross-examination at Petitioner's trial.  Accordingly, Petitioner cannot satisfy either prong of the *Strickland* analysis, and the Court finds that the state appellate court's denial of this IAAC claim was not objectively unreasonable.

**E.     Witness Albert Bass (Claim Two and Sub-Claim 6-B)**

Petitioner contends that his rights were violated because the prosecutor failed to disclose an agreement between Bass and the State "in the form of a threat that if Bass did not testify for the State he would be subject to prosecution for murder and subject to the penalty of death" (Claim Two); and raises a related IAC claim based upon trial counsel's alleged failure to preserve this issue for

appellate review (Sub-Claim 6-B).  *See* Doc. No. 1 at 6;  Doc. No. 11 at 11 (arguing that the prosecutor violated the principles of due process as defined in *Brady v. Maryland*, 373 U.S. 83 (1963)).

Petitioner raised these claims in the Rule 3.850 proceeding.  In denying the claims on the merits, the state trial correctly set forth the legal standard articulated by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny.  (App. F at 2).  Noting Petitioner's concession that he was "aware that Bass had been promised his words would not be used against him," the state court reasoned:

> Implicit in a promise that a witness's words cannot be used against him is the reality that he *could* be charged with a criminal offense.  Bass's testimony revealed that he was responsible for obtaining the heroin which [Petitioner] directed Tony Villacana to give to the victim, which caused the victim's death, and also that [Bass] assisted in removing the body from the house.  The prosecutor may very well have "threatened" Bass with a murder charge if he did not cooperate, but given the facts and circumstances of this case, such a 'threat' would have come as no surprise to defense counsel, who had previously deposed Bass in the presence of the prosecutor.  Therefore, it cannot be said that the information was suppressed, since the immunity agreement was disclosed, and it also cannot be said that the absence of details regarding a "threat" to prosecute resulted in prejudice.

*Id.* at 3 (record citations omitted).  The state courts' finding that no material information was suppressed by the prosecutor is consistent with the law and the record.[22]  Accordingly, Petitioner cannot prevail on his claim of prosecutorial misconduct or his related IAC claim.

---

[22]The Court notes that, aside from his own representations, Petitioner has provided no evidence to support his claim that the prosecutor actually threatened Bass with the death penalty. In this regard, these claims must be denied as mere speculation.

F.      **Impeachment of State Witnesses (Sub-Claims 6-B and 6-E)**

Petitioner claims that his trial counsel was ineffective for failing "to set the proper predicate for appellate review" in that she failed to properly challenge the testimony of Bass, Fatigate, Cockrell and Villacana (Sub-Claim 6-E).   (Doc. No. 1 at 15-16).   Petitioner further claims that his trial counsel "was ineffective in the cross-examination of Bass because counsel unreasonably limited the questioning of Bass about Bass's immunity and failed to explore any bias or motivation that Bass might have in testifying for the State" (Sub-Claim 6-B).   *See id.* at 15 (contending that trial counsel was ineffective "for failure to set the proper predicate for appellate review" with regard to her impeachment of Bass).

Petitioner raised both of these sub-claims in the Rule 3.850 Proceeding, and the state trial court rejected them on the merits.   The state trial court held that "Bass's bias and motive for testifying were adequately explored, and there is no reasonable probability that the outcome of the proceeding would have been different if counsel had asked additional questions."   (App. F at 4 (citations to record omitted)).   The state trial court further found that "the record demonstrates that counsel conducted a thorough and adequate cross-examination" of Bass, Fatigate, Villacana and Cockrell, and there was "no reasonable probability that additional cross-examination on counsel's part would have made a difference in the outcome of the proceedings." *Id.* at 11.  The state appellate court affirmed *per curiam*.

The state courts' rejection of Petitioner's IAC claims is amply supported by the record and is consistent with clearly established federal law.   Bass testified that: (1) he had been granted immunity with regard to Amy Braccio's murder,  (2) he was currently serving a sentence of sixty-three months for conspiracy to possess cocaine, and (3) a motion had been filed on his behalf to

reduce the sixty-three month sentence based upon his cooperation in the prosecution of Petitioner. (App. A at 337-38).  The motivations of Fatigate, Cockrell and Villacana to testify for the State were similarly developed on the record.  Indeed, a review of the record reveals that Petitioner's counsel's cross-examination of the State's witnesses was thorough.  Accordingly, Petitioner cannot prevail on these IAC claims.

**G.      Failure to Hold a *Richardson* Hearing (Sub-Claim 1-H)**

Petitioner claims that his appellate counsel was ineffective for failing to argue on appeal that "the trial court erred in permitting undisclosed statements of the defendant to be placed before the jury over counsel's objection" and for failing to argue that the trial court erred by "failing to conduct a *Richardson* hearing."  (Doc. No. 1 at 10-11).  Petitioner raised this claim in his state petition for writ of habeas corpus, and the state appellate court rejected the claim without a written opinion. (App. E).  A review of the record reveals that Petitioner's claim is entirely without merit because the trial court sustained counsel's objection; accordingly, no "undisclosed statements" were "placed before the jury over counsel's objection."

**H.      The Independent Act Jury Instruction (Sub-Claims 1-D and 1-G)**

Petitioner claims that his appellate counsel was ineffective in failing to "raise before the court of appeal the issue of the trial court erring in denying petitioner's requested [independent act] jury instruction"[23] (Sub-Claim 1-G).  (Doc. No. 1 at 10).  Petitioner further claims that appellate counsel

---

[23]The Court notes that "[s]tate court jury instructions ordinarily comprise issues of state law and are not subject to federal habeas corpus review absent fundamental unfairness." *Jones v. Kemp*, 794 F.2d 1536, 1540 (11th Cir. 1986).  Indeed, "[a] defective jury charge raises an issue of constitutional dimension only if it renders the entire trial fundamentally unfair."  *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983).  Here, Petitioner has raised the jury instruction issue as an IAAC claim; thus, the Court must assess the claim under *Strickland*.

46

was ineffective in not arguing that the trial court "crossed the line of neutrality and impartiality" in

his handling of the request for an independent act

instruction (Sub-Claim 1-D).  *Id.* at 9.  Petitioner raised these claims in his state petition for writ of

habeas corpus, and the claims were denied without a written opinion.  (App. E).

Here, Petitioner's counsel requested that "the independent act instruction" be given because:

> [T]he jury could reasonably believe that [decapitating Amy Braccio] was the independent act of Villacana.  Mr. Villacana is the only one that has testified that he received . . . the order to decapitate the victim and chop her hands off from [Petitioner].  And I believe the jury could reasonable believe that was Mr. Villacana's independent act.

> He – Mr. Villacana indicated that when he got that order, he was standing by the fire with [Petitioner] and Albie [Bass].  And Albie indicated during his testimony that he didn't – he never heard [Petitioner] indicate that was something that should be done.

(App. A at 784-86).  The trial judge expressed his understanding of the appropriate circumstances

to give the independent act jury instruction, *id.* at 785-86 (explaining that the instruction should be

given when the argument would be "we didn't mean to commit murder, we meant to steal bubble

gum"),[24] and the prosecutor objected to the instruction.  *Id.* at  785.  The issue was then reserved for

---

[24]The trial judge further explained:

> My understanding of [the] independent act instruction is that when two individuals commit a crime or agree to commit some act, let's say commit petit theft and one person will act as the lookout.  And that one person arms themselves and without any foreseeability starts blasting people that they can argue, I didn't intend to participate in any murder.  The act was completely independent of our plan.  And how does that apply in this case where there are acts that just are not reasonably foreseeable consequences of a common design or unlawful act?

> Maybe I should ask if the State objects.  Because I don't mean to be going through this by myself.  But that's what I understood independent act would be.  It might be that the State doesn't object to it being given.

(continued...)

further discussion. *Id.* at 786 (ruling that the proposed instruction would remain pending further

argument). Ultimately, the trial court denied Petitioner's request for the independent act instruction

as follows:

> I don't think the Independent Act instruction – having read those cases,
> listened to this evidence, I've taken notes from every witness, I don't think it's
> applicable in this case. I think that you can argue a number of things, but . . . . I don't
> believe there is any evidence to support that this was a common plan from which
> someone deviated.
>
> And the cases that I've read, including *Barfield*, include a common plan, such
> as, let's go steal this ATM, and then someone shoots someone. That was never a part
> of the plan. . . . I just don't believe that we have that in this case. So I'm going to
> eliminate from this draft, the Independent Act.

*Id.* at 804-05.

Here, the State presented a compelling case that Petitioner decided to kill Amy Braccio

because she was a snitch, and he instructed Villacana to kill her. Based upon this evidence, the trial

court was correct in distinguishing those cases where a murder occurred as an unexpected event in

a criminal episode. *See Thomas v. State*, 787 So. 2d 27 (Fla. 2d DCA 2001) (holding independent

act instruction should have been given where evidence showed parties agreed only to a robbery, and

defendant attempted to halt the robbery when he learned that his co-defendant unexpectedly brought

a gun); *Barfield v. State*, 762 So. 2d 564 (Fla. 5th DCA 2000) (explaining that independent act

instruction "applies to a situation in which, after participating in a common plan or design to commit

a crime, one of the co-defendants embarks on acts not contemplated by the other"); *see also Ray v.*

*State*, 755 So. 2d 604, (Fla. 2000) (holding that the trial court did not err in refusing to give

---

[24](...continued)

(App. A at 785). These are the comments that Petitioner contends demonstrate judicial bias.

independent act instruction).  Thus, Petitioner's appellate counsel could reasonably conclude that the jury instruction issue, while preserved for review,[25] was a claim without merit.  *Alvord*, 725 F.2d at 1291 (11th Cir. 1984).  Further, given the strength of the State's case against Petitioner, the state appellate court could reasonably conclude that Petitioner was not prejudiced by his counsel's failure to raise this jury instruction issue on direct appeal.  Accordingly, Petitioner's IAAC claim must be denied pursuant to section 2254(d).

Finally, Petitioner's contention that the trial court exhibited bias in favor of the prosecution is completely refuted by the record and is unworthy of discussion.  It is sufficient to note that the transcript reveals that the trial judge presided over Petitioner's trial in a fair and impartial manner.

## I.     The Prosecutor's Statements (Claim Seven, and Sub-Claims 1-C, 1-E, 1-I and 6-C)

Petitioner contends that the prosecutor engaged in misconduct when he made the following statements during his opening statement and closing argument: (1) referring to Petitioner as a "drug kingpin"; (2) calling Petitioner a "liar" and opining that he "did it";  and (3) referring to "plots hatched in hell" (Claim Seven).  (Doc. No. 11 at 4-5).  Petitioner also claims that he is entitled to a writ due to the deficient performance of his trial and appellate counsel in failing to assert claims at trial and on appeal arising from the prosecutor's statements (Sub-Claims 6-C (trial counsel was ineffective for failing to object to the prosecutor calling Petitioner a liar and saying he "did it"), and Sub-Claims 1-C, 1-E and 1-I (ineffective assistance of appellate counsel)).

Claims based on the statements of a prosecutor are assessed using a two-pronged analysis: first, the court must determine whether the comments at issue were improper, and, second, whether

---

[25]Petitioner's counsel presumably renewed her objection to the trial court's ruling at the end of trial.  *See supra*, Part III.A.8 (setting forth relevant portion of trial transcript).

any comment found to be improper was so prejudicial as to render the entire trial fundamentally

unfair. *Davis v. Kemp*, 829 F.2d 1522, 1526 (11th Cir. 1987). A trial is rendered fundamentally

unfair if "there is a reasonable probability that, but for the prosecutor's offending remarks, the

outcome . . . would have been different . . . . [A] reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Williams v. Kemp*, 846 F.2d 1276, 1283 (11th Cir. 1988)

(citations and quotations omitted). In *Drake v. Kemp*, the Eleventh Circuit explained:

> Improper argument will only warrant relief if it renders a petitioner's trial or
> sentencing fundamentally unfair. That determination depends on whether there is a
> reasonable probability that, in the absence of the improper arguments, the outcome
> would have been different. A reasonable probability is a probability sufficient to
> undermine confidence in the outcome.

762 F.2d 1449, 1458 (11th Cir. 1985)(citations and quotations omitted).

### 1.    "Small Time Drug Kingpin" Comment

During his opening statement, the prosecutor referred to Petitioner as a "small time drug

kingpin." (App. A at 299). Petitioner's counsel moved for a mistrial, and the state court denied the

motion. *Id.* at 300-01. Petitioner contends that the prosecutor engaged in misconduct, the trial court

erred in denying the motion for mistrial, and Petitioner's appellate counsel was ineffective in failing

to raise these issues on appeal. (Doc. No. 1). Respondents contend that Petitioner's claims of

prosecutorial misconduct and trial court error are procedurally barred, and his claim that appellate

counsel provided ineffective assistance is without merit because the "drug kingpin" comment was

not improper or prejudicial. (Doc. No. 15 at 38). Respondents are correct.

Petitioner's claims of prosecutorial misconduct and trial court error were raised by Petitioner

in the Rule 3.850 proceeding, and the state court denied them as "procedurally barred" because they

"could have been and should have been raised on direct appeal." (App. F at 5 & 12). Petitioner's

claim that his appellate counsel should have raised claims regarding the "drug kingpin" comment on direct appeal were denied by the state appellate court without a written opinion.

The state court's rejection of these claims is consistent with clearly established federal law and is supported by the record.  The Court finds that reference to Petitioner as a "small time drug kingpin," while not the best terminology, was not improper in the context of this trial.  At the time of petitioner's trial,  "kingpin" was simply defined as "a person or thing of chief importance." WEBSTER'S DICTIONARY 723 (2d ed. 1997); *e.g.* http://www.m-w.com/dictionary/kingpin (defining "kingpin" as  "the chief person in

a group or undertaking").  Here, the record is overwhelming that Petitioner was the source of cocaine for Villacana, Fatigate, Bass, Amy Braccio, and others, and that Petitioner's ability to provide cocaine gave him authority over these individuals.   Indeed, numerous witnesses testified that Petitioner's drug business provided the motive and the means for Amy Braccio's murder.  Thus, even assuming that the prosecutor's comment was somehow improper, it in no way rendered the entire proceeding unfair. Accordingly, Petitioner's claims regarding the "drug kingpin" comment are without merit.

**2.      Comments That Petitioner Was a "Liar" and He "Did It"**

During his closing argument, the prosecutor made the following comments:

> The Defense has said, you know, it's like kids.  You listened to the State's witnesses, oh, they lied to get out of trouble. [L]et's check the defendant's statements.  Because when Amy Braccio's father came to that house at the end of January to collect the rent, he said, where is Amy.  And the defendant said, he, she went away for a couple of days.  Exactly what the plan was; exactly what they'd all conspired and agreed to do; she went off.

> [A]nd so when Albie Bass, Bruce Fatigate, and Anthony Villacana say that the defendant told us to say the same thing, it just rings true.  So why is this

defendant telling that to her father?  And why, again, is he saying to her mother, she ran off with some guys who were going to go work with the cops; I told her it was dangerous, we argued, me and Amy, the defendant and Amy?  **Why would he be spinning that lie? He said it as a coverup, because he did it.**

And so it came that he was able to report to Ms. Rushing, that her daughter's last words were, fuck you, knowing that he's talking to the mother of that dead girl. **So why would he tell such a lie?  Well, let's leave that hanging here in the air. Maybe the Defense, when they come back up, maybe they have an answer.  But there is no answer because there's one answer.**

(App. A at 838-39 (emphasis added)).  Petitioner's counsel objected and an indiscernible sidebar ensued, after which, the trial judge instructed the jury that the State bore the burden of proof and Petitioner had no obligation to prove anything.  *See supra* Part III.A.7 (addressing Petitioner's claim that his appellate counsel rendered ineffective assistance in failing to bring the indiscernible portion of the transcript to the attention of the appellate court).

The state courts rejected, as "procedurally barred," Petitioner's claim that the statements that Petitioner was a liar and he "did it" amounted to prosecutorial misconduct.  The state courts also rejected Petitioner's related IAC claim on the merits as follows:

The prosecutor used the word 'lie' in arguing that [Petitioner] lied to the victim's parents when he told them she left with another man and moved out of the house, to cover up the fact that [Petitioner] 'did it.'  However, while these were not the most appropriate words to use in closing argument, this Court declines to find that the prosecutor's argument was so egregious an error that counsel's failure to object resulted in prejudice to the outcome of the trial.

(App. F at 5).  The state appellate court *per curiam* affirmed.

The state courts' rejection of Petitioner's ineffective assistance of counsel claim is consistent with clearly established federal law and is supported by the record.  The Court notes that the comments complained of here were brief, and the comment that Petitioner lied to the victim's mother regarding Amy Braccio's whereabouts was a fair assessment of the evidence before the jury.

52

Nonetheless, even assuming that the prosecutor's comments were improper, when considered in the context of the entire proceeding, such comment did not render the trial unfair.  Further, Petitioner has not demonstrated that "there is a reasonable probability that, but for the prosecutor's offending remarks, the outcome . . . would have been different."  *United States v. De La Vega*, 913 F.2d 861, 872 (11th Cir. 1990) (prosecutorial remarks that defendant was "tripping over his own lies" and that the defense was using "smokescreens" were innocuous and defendant received a fair trial).  Accordingly, Petitioner cannot prevail on his claims related to the comments that Petitioner "lied" and "did it."

### 3.       "Plots Hatched in Hell"

In his closing argument, the prosecutor commented:  "Now, there's an old saying, and it applies to this case.  And there is no doubt what I'm going to tell you applies to this case.  And the saying is.  Angels do not bear witness to plots hatched in hell.  They don't."  (App. A at 828).  Petitioner's counsel objected to this statement and presumably moved for a mistrial at an indiscernible sidebar.  *See supra*, Part III.A.7 (addressing Petitioner's claim related to a transcription error).  According to Petitioner, his appellate counsel was ineffective in failing to argue on appeal that the prosecutor engaged in misconduct and he was entitled to a mistrial.  (Doc. No. 1).

The Court does not find that the prosecutor's statement was improper or that Petitioner suffered an unfair trial or other prejudice.  Courts commonly reject claims based upon similar comments.  *See Hannon v. State*, 941 So. 2d 1109, 1143 (Fla. 2006) (holding that the defendant could show no prejudice based upon his trial counsel failing to object to the statement during the State's closing argument that "sometimes you need to make a deal with a sinner in order to get the devil.");  *Moore v. State*, 820 So. 2d 199, 207 (Fla. 2002) (holding that the defendant could show

no prejudice based upon his trial counsel failing to object to the State referring to the defendant as the "devil" in his closing argument and stating that a "[c]rime conceived in hell will not have any angels as witnesses"); *see also Matthews v. Sirmons*, Case No. 03-CIV-417, 2007 WL 2286239 (W.D.Ok., August 6, 2007) (rejecting a claim of prosecutorial misconduct based upon the prosecutor's statement during his closing argument that "[w]hen you cast a play in hell, you don't always get angels for your witnesses"). Because the "plots hatched in hell" comment was not misconduct and did not justify a mistrial, Petitioner's appellate counsel cannot be considered deficient for failing to raise such claims on direct appeal.

**J.     Cumulative Error (Sub-Claim 1-L)**

Petitioner claims that his appellate counsel was ineffective for failing to argue on appeal that the cumulative effect of the errors in his trial tainted or contributed to the jury's verdict. (Doc. No. 1 at 13). Respondents contend that this claim must be denied because Petitioner never raised it in state court. (Doc. No. 15 at 25). Petitioner correctly notes that the claim must be considered on the merits because he raised it in his state petition for writ of habeas corpus. (Doc. No. 27 at 2; App. E at 47).

The state appellate court denied Petitioner's "cumulative error" IAAC claim without a written opinion. The Court finds that the state appellate court's summary denial of this claim was proper because the collection of alleged errors are largely without merit. *See supra*, Parts III.A & III.D to III.I. Further, after reviewing the proceedings and considering the claims collectively, this Court cannot conclude that Petitioner's "trial, as a whole, was fundamentally unfair and outside the bounds of the Constitution." *Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004). Accordingly, Petitioner cannot establish either prong of the *Strickland* analysis, and this claim fails.

54

**K.      The Trial Court's Jurisdiction to Impose Petitioner's Sentence (Claim Nine)**

Petitioner claims that his conviction for first degree murder rests "upon constitutionally, as well as statutorily unlawful jurisdiction" because the Office of the Statewide Prosecutor lacked jurisdiction to prosecute his case, and the trial court lacked jurisdiction to sentence him.  (Doc. No. 1 at 16-17).  Petitioner raised this claim in his Rule 3.800(a) motion.  (App. I).  The state trial court rejected the claim because it was "actually a challenge to the judgment rather than to the sentence itself," and, even if the claim were true, it would not render his sentence illegal.  *Id.* at 2 (citing *Carter v. State*, 786 So. 2d 1173 (Fla. 2001) and *Lemar v. State*, 823 So. 2d 231 (Fla. 4th DCA 2002).  In any case, the state trial court noted that:

> [T]he record demonstrates that the various acts constituting the entire offense did occur in two or more judicial circuits.  According to the testimony presented at trial, [Petitioner] told Tony Villacana to give the victim cocaine and heroin until she was dead.  After the third injection, Villacana believed the victim was indeed dead. However, a victim in the throes of a heroin overdose may *appear* to be dead, when in fact, her breathing and heart rate are almost impossible to detect without medical training.  Villacana then loaded the victim into [Petitioner's] car, drove it to the Ocala National Forest, lay the victim on the ground, and cut off her head and hands. Significantly, the site where he left the body was in Marion County, outside the territorial boundary of the Ninth Judicial Circuit, which covers only Orange and Osceola counties.  Due [to] the advanced state of decomposition of the body, it was impossible to determine the exact cause of death, but the medical examiner opined that death could have occurred from the decapitation rather than the drug overdose. On these facts, the Office of Statewide Prosecution did have jurisdiction to prosecute murder charged in this case.

(App I at 2-3 (record citations omitted)).

There is no indication that the result reached by the state court was at odds with any United States Supreme Court case which considered "materially indistinguishable facts."  Finally, the state court's decision was objectively reasonable and supported by the record.  Thus, the court finds this

claim is subject to denial under section 2254(d), and is procedurally barred because it was never properly presented to the state court.

## L.    The Indictment (Claim Ten)

Petitioner claims that his "due process rights under the state and federal Constitution[s]" have been violated because "the trial court lacked subject matter jurisdiction to try [him] of a capital offense not charged by the grand jury" and because "the State was allowed to substantively alter and amend the indictment [at trial] by charging and trying [him with] with the crime of capitol felony murder, a crime not charged, nor alleged by the grand jury indictment." (Doc. No. 1 at 17-18).

Petitioner raised this claim in the Rule 3.850 proceeding, and that state trial court denied the claim as "procedurally barred." (App. F at 10). The state trial court also held that the claim "lacks merit, as the State is permitted to charge premeditated murder and then proceed on a felony murder theory as well." *Id.* (citing *State v. Ingleton*, 653 So. 2d 443 (Fla. 5th DCA 1995) and *Knight v. State*, 338 So. 2d 201 (Fla. 1976)). The state appellate court affirmed *per curiam*. Because the state courts denied this claim as procedurally barred, this Court is precluded from considering it on the merits. Petitioner has not argued that either of the two exceptions exist to excuse the default;[26] thus, this claim is denied.

## M.    Absence of Written Opinions (Claim Eight)

Petitioner claims that his "liberty interest against arbitrary deprivation by State" was violated because he "filed several motion[s] for post-conviction relief to the lower tribunal court, and that

---

[26]For the bulk of Petitioner's defaulted claims, he argued that the cause and prejudice exception was satisfied because his appellate counsel rendered ineffective assistance in failing to raise the defaulted claims on direct appeal. Petitioner made no such argument with regard to this claim.

court has denied [the motions] in each instance without issuing a written opinion." (Doc. No. 1 at 16). Respondents contend that this claim must be denied because Petitioner never raised it in state court. (Doc. No. 15 at 25). Petitioner contends that he exhausted this claim by raising it as "ground (1)" in his petition for "All Writs Jurisdiction" filed with the Supreme Court of Florida. (Doc. No. 27 at 2).

A review of the petition for "All Writs Jurisdiction" reveals that Petitioner did not raise the claim asserted here. (App. K). The argument Petitioner points to does not refer to any failure by the state trial or lower appellate court to issue a written opinion. Rather, ground one alleges that the Florida Supreme Court would violate Petitioner's Fourteenth Amendment Right "against arbitrary deprivation" if it failed to "depose [sic] of the instant" petition "in accordance with well established state procedures." *Id.* Because Petitioner did not raise this claim before any state court, this Court is precluded from considering it on the merits. Petitioner has not argued that either of the two exceptions exist to excuse the default; thus, this claim is denied.

## IV.   CONCLUSION

The Court finds that additional briefing is required with regard to the claims specified in paragraph one below, and finds that the remaining claims raised in the instant petition lack merit and do not require a hearing in this Court. Further, any of Petitioner's allegations not specifically addressed herein are determined to be without merit.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     Within **TWENTY (20) DAYS** of the date of this Order, Respondents shall file a supplemental response showing cause why the writ should not be granted and why an evidentiary hearing should not be held as to the following claims:

57

(a)     that the trial court erred in permitting Jackson to assert a "blanket" right not to testify (Claim Five);

(b)     the IAA claim based upon counsel failing to argue trial court error in permitting Jackson to assert a "blanket" right not to testify (Sub-Claim 1-B);

(c)     the IAA claim based upon counsel failing to bring the omissions at pages 763 and 769 of the transcript to the attention of the state appellate court (Sub-Claim 1-A);

(d)     the IAA claim based upon counsel failing to argue trial court error in permitting Cockrell to testify to Bass's out of court statements (Sub-Claims 1-J and 1-K); and

(e)     the IAA claim based upon counsel failing to bring the omission at page 699 of the transcript to the attention of the state appellate court (Sub-Claim 1-A).

2.     The remaining claims set forth in the Petition for Writ of Habeas Corpus filed by John Jay Dittrich (Doc. No. 1) are **DENIED**.

**DONE AND ORDERED** at Orlando, Florida, this 6th day of December, 2007.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies to:
pslc 12/6
John Jay Dittrich
Counsel of Record