UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN JAY DITTRICH,

      Petitioner,

v.                                      CASE NO. 6:05-cv-1289-Orl-31GJK

SECRETARY, DEPARTMENT
OF CORRECTIONS, et al.,

      Respondents.

_____

## ORDER

      Petitioner initiated this action for habeas corpus relief pursuant to 28 U.S.C. section 2254 (Doc. No. 1).  Upon consideration of the petition, the Court ordered Respondents to show cause why the relief sought in the petition should not be granted.  Thereafter, Respondents filed a response to the petition for writ of habeas corpus in compliance with this Court's instructions and with the *Rules Governing Section 2254 Cases in the United States District Courts* (Doc. No. 15).  Petitioner filed a reply to the response (Doc. No. 27).

      On December 6, 2007, this Court found that additional briefing was necessary with respect to five claims in Petitioner's habeas petition and concluded that the remaining claims in the petition lacked merit.  (Doc. No. 29.)  Pursuant to the instructions of the Court, Respondents filed a supplemental response (Doc. No. 37) and Petitioner filed a reply to the supplemental response (Doc. No. 38).

# I.   Background

## A.   Procedural History and Factual Background[1]

On April 5, 1999, Petitioner and Anthony Villacana ("Villacana"), were charged by indictment with first-degree murder of Amy Braccio.  (App. B at 106.)  Specifically, the indictment charged that Petitioner and Villacana did, "in violation of Florida Statutes 782.04, form a premeditated design to effect the death of Amy Braccio, murder Amy Braccio . . . by delivering or administering to her a fatal overdose of cocaine and/or heroin or by decapitating her."  *Id*.  The State waived the death penalty.  *Id*. at 177.

On October 18, 2000, Villacana entered a plea of guilty to second-degree murder and agreed to provide truthful testimony regarding the murder of Amy Braccio.  *Id*. at 87-105.  The state trial court sentenced Villacana to twenty-three years in prison.  *Id*.

Petitioner proceeded to trial by jury on February 26 through March 2, 2001.  (App. A.)  The State called Villacana, Albert Bass ("Bass"), and Bruce Fatigate ("Fatigate"), to testify regarding the roles they and Petitioner played in Amy Braccio's death.  (App. A at 511-58 (testimony of Villacana);[2] *id*. at 336-402 (testimony of Bass);[3] *id*. at 439-86 (testimony

---

[1] The Court repeats in this section the facts of the case as recounted in its earlier opinion.  (Doc. No. 29 at 1-5.)

[2] Villacana testified that he had previously been convicted of five felonies, and he had pled guilty to second-degree murder of Amy Braccio pursuant to a plea agreement which required that he testify truthfully.  (App. A at 511-57.)  He further testified that at the time of Amy Braccio's murder he used and sold drugs, and Petitioner supplied him with cocaine.  Before Amy Braccio's death in January of 1998, Petitioner told Villacana that he believed she had provided information to the police regarding Petitioner's drug activities, and he instructed Villacana to give her enough heroin and cocaine to kill her.  Villacana agreed to Petitioner's request because he did not want to be cut off from his

2

source of cocaine.

According to Villacana, he obtained the necessary drugs and needles to kill Amy Braccio from Bass, who also sold cocaine for Petitioner. Villacana explained that he filled six syringes with the drugs and provided three of them to Amy Braccio in her bedroom. While Amy Braccio was injecting herself with these drugs, she expressed concern that Petitioner, who had a policy against heroin use, would not approve. Villacana then had Petitioner come into the house and assure her that it was okay with him if she took the drugs. According to Villacana, after Amy Braccio injected herself with the contents of the third syringe she started shaking and fell to the floor, and he believed she was dead. Villacana then went to Petitioner and asked him what to do with Amy Braccio's body. Petitioner instructed him to take her to the Ocala National Forest, chop off her head and hands, and leave her dismembered body in the open. Villacana testified that with the assistance of Bass and the use of Petitioner's Mazda Millenium, he fulfilled Petitioner's instructions.

After murdering Amy Braccio and disposing of her body, Villacana had Petitioner's car detailed and left it in a Wal-Mart parking lot. Villacana stayed at Petitioner's rented home for a few days, and also stayed at "Fisherman's Paradise" at Petitioner's expense. Villacana further testified that Petitioner forgave his drug debt after Amy Braccio's murder.

[3] Bass testified that the State had given him use immunity and derivative use immunity in order to testify truthfully regarding Amy Braccio's murder. (App. A at 348-50). According to Bass, shortly before the murder, Cathy Harrold told him that Amy Braccio had gone to the police with a man named Keith to inform on Petitioner. Bass related this information to Petitioner who appeared to be angry and confronted Amy Braccio who denied that she was an informant. After this encounter, Petitioner told Bass to obtain heroin and needles, even though Petitioner normally had a policy against dealing or using heroin. Cathy Harrold confirmed Bass's testimony that she told him Amy Braccio was going to inform on Petitioner. Bass's half-brother, James Dees, also testified that he heard Petitioner say that Amy Braccio was a police "snitch."

Bass confirmed aspects of Villacana's testimony, including that: (1) he, Fatigate, and Villacana sold and used cocaine supplied by Petitioner; (2) on the day of Amy Braccio's murder, he provided heroin, cocaine, and needles to Villacana at Petitioner's direction; (3) Bass and Villacana carried Amy Braccio's blanket-wrapped body from her bedroom and placed her in Petitioner's Mazda Millenium; and (4) Petitioner forgave Villacana's drug debt and paid for him to stay at "Fisherman's Paradise" after Amy Braccio's death. Bass also testified that two days after Amy Braccio's murder, he helped Petitioner retrieve the Mazda Millenium from a Wal-Mart parking lot and was instructed by Petitioner to tell

of Fatigate)).[4]   The State also called Cathy Harrold, James and Sharon Dees, Rhonda

Upchurch, and Amy Braccio's parents to corroborate aspects of the testimony of Villacana,

Bass and Fatigate.  *Id.* at 558-67 (testimony of Rhonda Upchurch); *id.* at 402-12 (testimony

of Cathy Harrold); *id.* at 415-17 (testimony of James Dees); *id.* at 735-41 (testimony of

Sharon Dees); *id.* 641-65 (testimony of Dawn and Neil Rushing).  The State also presented

testimony from Robert Cockrell regarding incriminating statements made by Petitioner

while he, Bass, and Petitioner were incarcerated together in Tennessee.[5]   *Id.* at 692-721.

---

people that Amy Braccio had moved out with her boyfriend.  Bass testified that Fatigate
burned Amy Braccio's belongings and also described overhearing Villacana tell Petitioner
that he had cut off Amy Braccio's head and hands, buried them, and left her body laying
on the ground.

    After the murder of Amy Braccio, Bass was arrested in Florida on cocaine charges,
and Petitioner flew him to Tennessee after he bonded out.  Bass was arrested again in
Tennessee, and was placed in the same cell block as Petitioner and an inmate named Robert
Cockrell.

    [4] Fatigate testified that he entered into an agreement with the State to plead guilty
to accessory after the fact to the first-degree murder of Amy Braccio and to testify
truthfully regarding her murder.  Like Bass and Villacana, Fatigate testified that in January
of 1998, he used and sold drugs, and Petitioner was his drug supplier.  Fatigate also
confirmed Bass's testimony that he delivered heroin to Bass and, at Petitioner's direction,
he disposed of Amy Braccio's belongings by burning everything except her stereo.  Fatigate
testified that Petitioner also instructed him to provide food to Villacana at Fisherman's
Paradise because Villacana had disposed of Amy Braccio's body.

    [5]Several witnesses testified regarding incriminating statements made by Petitioner
after Amy Braccio's death.  Fatigate testified that Petitioner commented to him that the
death of his dog was Amy Braccio's revenge on him, and, after seeing a report on television
regarding the discovery of Amy Braccio's decapitated body, Petitioner commented to
Fatigate's girlfriend, "See what happens to people who run their mouth."  (App. A at 452.)
Sharon Dees described overhearing a jovial conversation between Petitioner and Villacana
when Villacana told Petitioner that he gave "her" enough heroin to put out a horse and
dropped "her" off in Ocala.  *Id.* at 736-41.  James Dees testified that he heard Petitioner say

4

Finally, the State presented the testimony of the medical examiner, a forensic toxicologist, and investigating officers.  *Id*. at 487-506 (testimony of Detective David Michael Callin ("Detective Callin")); *id*. at 568-85 (testimony of Doctor Laura Hair); *id*. at 585-615 (testimony of Doctor George Jackson); *id*. at 617-41 & 721-28 (testimony of Detective Jeff Raker ("Detective Raker")).

At the close of the State's case, Petitioner moved for judgment of acquittal, and the trial court denied the motion.  (App. A at 742-58.)  Petitioner then called one witness, Errol Jackson ("Jackson"), who refused to testify pursuant to the Fifth Amendment to the United States Constitution.  *Id*. at 769-70.  After Jackson refused to testify, Petitioner rested his case.

The jury found Petitioner guilty of first-degree murder in that he committed the offense by "Premeditated Murder" and by "Felony Murder/Trafficking in Cocaine."  (App. B at 369 (Verdict Form)).  The state trial court then sentenced Petitioner to imprisonment for life without the possibility of parole.  (App. A at 880.)

On direct appeal, Petitioner raised one claim - that the trial court erred in denying his motion for judgment of acquittal.  (App. C.)  On January 8, 2002, the state appellate court *per curiam* affirmed.  (App. D.)  On July 31, 2002, Petitioner filed a petition for writ of habeas corpus arguing that his appellate counsel provided him with ineffective assistance. (App. E.)  The state appellate court ordered the State to show cause why the relief

---

that "she sold him out to the police" and was "taken care of."  *Id*. at 420-21.  Finally, Robert Cockrell, who had been incarcerated with both Petitioner and Bass at a federal prison in Tennessee, testified that Petitioner told him he had a girl in Florida killed who was going to snitch on him.  *Id*. at 689-720.

requested should not be granted, and the State filed a detailed response on September 5, 2002. *Id.* The state appellate court summarily denied the state petition for writ of habeas corpus on October 17, 2002. *Id.*

On July 25, 2002, Petitioner filed a motion for postconviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure. (App. F.) Thereafter, Petitioner filed several amendments, supplements, and an addendum. *Id.* On February 17, 2004, the same state judge who presided over Petitioner's trial entered a written order summarily denying all of the claims raised in Petitioner's Rule 3.850 motion and in his various amendments, supplements, and addendum. *Id.* After his motion for rehearing was denied, Petitioner appealed, and the state appellate court *per curiam* affirmed. (App. G.) Mandate issued on July 15, 2004. *Id.*

On September 28, 2004, Petitioner filed a motion to correct an illegal sentence pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure. (App. I.) In a written order, the state trial court denied relief on February 7, 2005, and Petitioner appealed. (App. J.) The state appellate court *per curiam* affirmed on May 17, 2005. *Id.* Mandate issued on July 15, 2005. *Id.* Two weeks later, Petitioner filed a petition for "All Writs Jurisdiction" with the Florida Supreme Court. (App. K.) The Florida Supreme Court denied the petition without a written opinion on August 1, 2005. *Id.* One month later, Petitioner filed the instant timely petition for writ of habeas corpus pursuant to 28 U.S.C. section 2254. (Doc. No. 1.)

B.     **Summary of Claims**

The remaining claims in Petitioner's habeas petition relate to Errol Jackson's refusal to testify pursuant to the Fifth Amendment and Robert Cockrell's in-court testimony regarding Bass's out-of-court statements.  Petitioner's claims related to Jackson are that (1) the trial court erred in giving "Jackson, the sole defense witness, a 'blanket' right not to testify," after he asserted his Fifth Amendment privilege against self-incrimination (claim one);[6] (2) appellate counsel rendered ineffective assistance by failing to raise this alleged trial court error on appeal (claim two);[7] and (3) appellate counsel rendered ineffective assistance by failing to raise two related transcription errors on appeal (claim three).[8]  With regard to Cockrell's in-court testimony, Petitioner contends that his appellate counsel rendered ineffective assistance by (1) failing to argue that the trial court erred by overruling defense counsel's hearsay objection to Bass's out-of-court statements (claim four),[9] and (2) failing to raise a claim related to an indiscernible sidebar conference (claim five).[10]  For the following reasons, the remaining claims in the petition are denied.

---

[6] This claim was addressed as claim five in section III.B. of the Court's previous opinion.

[7] This claim was addressed as sub-claim 1-B in section III.B. of the Court's previous opinion.

[8] This claim was addressed as sub-claim 1-A in section III.B. of the Court's previous opinion.

[9] This claim was addressed as sub-claims 1-J and 1-K in section III.C. of the Court's previous opinion.

[10] This claim was addressed as sub-claim 1-A in section III.C. of the Court's previous opinion.

## II.     Legal Standards

**A.     The Antiterrorism and Effective Death Penalty Act ("AEDPA")**

Because Petitioner filed his petition after April 24, 1996, this case is governed by 18 U.S.C. § 2254, as amended by the AEDPA.  *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003).  The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

**1.     Standard of Review Under the AEDPA**

Pursuant to the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432, F.3d 1292, 1308 (11th Cir. 2005), cert. denied, 127 S. Ct. 348 (2006). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Even if the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

## 2.    Exhaustion and Procedural Default

One procedural requirement set forth in the AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted

all means of available relief under state law.  28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Picard v. Connor*, 404 U.S. 279, 275 (1971).  Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that -
>
> (A)    the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)    (i)    there is an absence of available State corrective process; or
>
>         (ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  In addition, a federal habeas court is precluded from considering claims that are not exhausted but that would clearly be barred if returned to state court.  *Id.* at 735 n.1.

In order to satisfy the exhaustion requirement, a petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted)).  The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim.  *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998).  The United States Supreme Court has observed that

"Congress surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992). The Court further explained:

> [c]omity concern dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claims on the merits.

*Id.*; *see also Henderson*, 353 F.3d at 898 n.25 ("Both the legal theory and the facts on which the federal claim rests must be substantially the same for it to be the substantial equivalent of the properly exhausted claim.")

Procedural default will be excused only in two narrow circumstances. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice. To establish cause, "a petitioner must demonstrate that some objective factor external to the defense impeded [his] effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To establish actual prejudice, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different had the claim been presented. *Henderson*, 353 F.3d at 892 (citations omitted).

The second exception, known as the "fundamental miscarriage of justice" exception occurs only in the extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). "'To be credible,' a claim of actual innocense must be based on [new]

11

reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  Additionally, to meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense in light of the new evidence.  *Schlup*, 513 U.S. at 327.

## B.     Standard for Ineffective Assistance of Counsel[11]

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[12] *Id*. at 687-88.  A court must adhere to a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance.  *Id*. at 6890.  "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

---

[11] The Court will refer to claims alleging deficient performance of trial counsel as "IAC" claims, and claims alleging deficient performance of appellate counsel will be referred to as "IAAC" claims.

[12] In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.  Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight.  *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their client by pursuing their own strategy.  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).  Under those rules and presumption, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

### III.    Analysis

**A.    Errol Jackson**

According to Petitioner, Errol Jackson ("Jackson") was going to provide favorable testimony, but did not do so because the prosecutor "threatened and intimidated" Jackson "with prosecution for conspiracy to commit murder if Jackson merely testified for the defense." (Doc. No. 1 at 11-12.)  At trial, Petitioner's counsel called Jackson as Petitioner's only witness, and after consultation with his own counsel, Jackson refused to answer any questions based upon the Fifth Amendment right against self-incrimination.  After two indiscernible sidebar conferences, the trial court excused Jackson, and the defense rested.

This Court previously concluded that Petitioner's claim of trial court error in permitting Jackson to assert a "blanket" right not to testify was procedurally barred because the state trial court held that it "could have been and should have been raised on direct appeal." (Doc. No. 29 at 31.)  However, this Court found that Petitioner was attempting to excuse his procedural default by asserting a claim that his appellate counsel rendered ineffective assistance by failing to raise the alleged trial court error on direct appeal.  *Id.*

A petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice.  To establish cause, "a petitioner must demonstrate that some objective factor external to the defense impeded [his] effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).  To establish actual prejudice, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different had the claim been presented.  *Henderson*, 353 F.3d at 892 (citations omitted).  The ineffective assistance of trial or appellate counsel may support a finding of cause only if counsel's performance was "so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  Thus, if a petitioner "cannot prevail on a separate ineffective assistance of counsel claim, then he cannot prevail on an argument that ineffective assistance caused the procedural default." *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (holding that cause for a procedural default will not be found if the petitioner fails to satisfy the two elements of the *Strickland* analysis).  In addition, the petitioner must have presented the

IAC or IAAC claim "to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 489 (1986).

In his state habeas petition, Petitioner argued that appellate counsel was ineffective for failing to raise the trial court error claim regarding Jackson on direct appeal, and the state appellate court summarily denied the petition without a written opinion. (App. E.) Thus, Petitioner exhausted the IAAC claim in the state courts, and this claim is properly subject to federal habeas review. Accordingly, this claim may support a finding of cause for Petitioner's procedurally barred trial court error claim if appellate counsel rendered ineffective assistance. Alternatively, if Petitioner is unable to prevail on his IAAC claim, then his claim of trial court error regarding Jackson is procedurally barred.

### 1.      IAAC and Trial Court Error Regarding Jackson (Claims One and Two)

It is well established that a defendant has the right to effective assistance of counsel on appeal. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir.), *cert. denied*, 469 U.S. 956 (1984). The Eleventh Circuit Court of Appeals has applied the United States Supreme Court's test for ineffective assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987). Thus, in order to establish ineffective assistance of appellate counsel, a petitioner must show (1) that counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Appellate counsel is not ineffective for failing to raise claims "reasonably considered to be

without merit." *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984).  Therefore, this Court must examine the alleged trial court error to determine whether Petitioner's appellate counsel was ineffective for failing to raise it.

Petitioner asserts that Jackson would have testified that he heard Villacana say that Petitioner was not involved in the death of Amy Braccio.  (Doc. No. 11 at 3.)  The transcript reveals that after Jackson was sworn, he asked to speak with his attorney, and the trial judge asked Petitioner's counsel to proffer the areas on which she intended to question Jackson.  (App. A at 762.)  Petitioner's counsel responded:

> Your Honor, I have never spoken with this witness because he's represented by Counsel and [I] did not have permission to do so.  It is my understanding that he did share a cell with Mr. Villacana, or at least a pod.  And that Mr. Villacana did in fact tell him some things with regard to this incident.  And that Mr. Villacana might have . . .

*Id*.  The State then requested that the proffer not occur in the presence of the witness, and the trial judge asked the attorneys to approach.  *Id*.  At that point, the transcript provides that "**There was an indiscernible side-bar conference**."  *Id*. at 763 (emphasis added).

Following the indiscernible side-bar conference, the trial judge explained to Jackson that neither the State nor the Court was extending immunity to him, and "there is an issue about whether you have the right to assert your Fifth Amendment privileges [sic] not to give testimony that could be used to prosecute you in this proceeding.  And that's where we are and that's a decision you have to make."  *Id*. at 763.  Jackson then asked for additional time to consult with his counsel, and the trial judge ordered that Jackson and his counsel be taken to a holding cell to talk privately.  *Id*. at 764.  When Jackson and his

counsel returned to the court room, Petitioner's counsel attempted to question Jackson as

follows:

| Ms. Munyon: | Mr. Jackson, are you currently housed in the Orange County Jail? |
|---|---|
| [Jackson's Counsel]: | Your Honor, at this time, Mr. Jackson will invoke his Fifth Amendment Right, self incrimination if he's to answer any more questions.   Is that correct Mr. Jackson? |
| [Jackson]: | Yes. |
| The Court: | Ms. Munyon? |
| Ms. Munyon: | He refuses to answer any more questions at all? |
| [Jackson's Counsel]: | Any more questions. |
| Ms. Munyon: | I have nothing further, Your Honor, except to ask . . . may we approach? |
| The Court: | (No Verbal Response) |
| WHEREUPON: | **There was an indiscernible side-bar conference**, after which the proceedings were as follows: |
| The Court: | All right.   Thanks, Mr. Jackson.   The court deputies are going to take you back to the main jail. |

*Id.* at 769 (emphasis added).[13]

-----

[13] Petitioner provided handwritten notes from his trial counsel indicating that, during the indiscernible side-bar conference at page 763, she "finished the proffer and began talking to the court about immunity" for Jackson.  (Doc. No. 1, Appendix B, Exhibit 1.)   Petitioner provided no similar evidence regarding what occurred during the indiscernible side-bar noted at page 769 of the trial transcript.

17

The Constitution establishes the right of a criminal defendant "to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI.  As the United States Supreme Court has elaborated, "the right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  The accused's right to compulsory process, however, does not include the right to compel a witness to waive his Fifth Amendment privilege.  *See Kastigar v. United States*, 406 U.S. 441, 444 (1972); *United States v. Thornton*, 733 F.2d 121, 125 (D.C. Cir. 1984); *United States v. Moore*, 682 F.2d 853, 856 (9th Cir. 1982).

The Fifth Amendment to the United States Constitution declares in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  In *Hoffman v. United States*, 341 U.S. 479 (1951), the United States Supreme Court enunciated the standard for measuring when a witness may properly claim his right against self-incrimination, and thus refuse to respond to questioning:

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it was asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result . . . .

*Id.* at 487.  The *Hoffman* Court stated that the Fifth Amendment privilege is applicable where the witness has "reasonable cause to apprehend danger from a direct answer." *Id* at 486.  The Court also indicated that a simple blanket declaration by the witness that he cannot testify for fear of self-incrimination will not suffice to invoke the privilege. *Id.* ("The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself - his say-so does not of itself establish the hazard of

incrimination.").  "[C]ourts cannot accept Fifth Amendment claims at face value, because that would allow witnesses to assert the privilege where the risk of self-incrimination was remote or even nonexistent, thus obstructing the functions of the courts."  *United States v. Melchor Moreno*, 536 F.2d 1042, 1046 (5th Cir. 1976).[14]

The legitimacy and scope of the privilege is ultimately a matter for the trial court to decide.  *United States v. Goodwin*, 625 F.2d 693, 701 (5th Cir. 1980).  Thus, the custom is for the judge to examine the protesting witness out of the presence of the jury in order to determine the validity of his claim.  *United States v. Gomez-Rojas*, 507 F.2d 1213, 1220 (5th Cir. 1975).[15]  The witness may allude in very general, circumstantial terms to the reasons why he feels he might be incriminated by answering a given question.  *Melchor Moreno*, 536 F.2d at 1046.  The judge should examine the witness only enough to determine whether there is reasonable ground to apprehend danger from being compelled to answer.  *Id.* "Once the court satisfies itself that the claim is well-grounded, it may, in its discretion, decline to permit either party to place the witness on the stand for the purpose of eliciting a claim of privilege or to comment on this circumstance."  *Gomez-Rojas*, 507 F.2d at 1220 (citing *United States v. Lacouture*, 495 F.2d 1237 (5th Cir. 1974)).

---

[14] Fifth Circuit cases "handed down . . . prior to the close of business" on September 30, 1981, are binding precedent on the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

[15] The *Gomez-Rojas* Court ordered the trial court to hold an evidentiary hearing on remand "to determine whether [the witness's] fear of self-incrimination [was] well-founded and what the parameters of his Fifth Amendment rights are in the context of the testimony that [the defendant] wishe[d] to obtain from him."  *Gomez-Rojas*, 507 F.2d at 1220.

The fact that the witness retains his Fifth Amendment privilege does not end the inquiry, however.  It is also necessary for the court to determine the proper scope of the privilege.  If the witness has a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions.  *Goodwin*, 625 F.2d at 701.  Accordingly, the witness may be excused only if the court finds that he could "legitimately refuse to answer essentially all relevant questions." *Gomez-Rojas*, 507 F.2d at 1220.  Otherwise, "only as to genuinely threatening questions should his silence [be] sustained." *Melchor Moreno*, 536 F.2d at 1049.

In the instant case, the record demonstrates that Jackson asserted his Fifth Amendment right to refuse to answer any question that could be asked of him.  There is no indication that the trial judge conducted an inquiry into the validity of Jackson's claim of privilege nor is there indication that, assuming a valid claim, the scope of the privilege extended to all possible relevant questions.  Even though a trial judge is accorded broad discretion in determining whether the privilege is properly invoked, "[a] blanket assertion of the privilege without inquiry by the court, is unacceptable." *Goodwin*, 625 F.2d at 701.

This Court is left, therefore, to speculate as to whether Jackson had a valid Fifth Amendment claim.  *See Moore*, 682 F.2d at 856 ("An unprobed, blanket refusal to testify would force a reviewing court to engage in such unacceptable speculation in order to evaluate the claimed privilege.").  The issue is further complicated by omissions in the trial transcript from the relevant side-bar conferences.  Jackson was a jail house inmate waiting to be tried on an unrelated first-degree murder charge.  Petitioner asserts that Jackson was

going to testify that Villacana told him that Petitioner had nothing to do with the victim's murder.   Assuming Petitioner's proffer of Jackson's testimony to be true, Jackson's testimony in reference to this matter would not appear to incriminate him.

In short, Jackson did not articulate a valid basis for asserting the privilege against self-incrimination and the trial court erred in recognizing his blanket invocation of the Fifth Amendment without a proper inquiry into its validity.   However, a review of the record reveals that the evidence against Petitioner was overwhelming and Jackson's testimony, even if admissible, would have been insufficient to overcome the testimony of multiple witnesses that Petitioner ordered the victim's death.[16]   As such, the Court concludes that the trial court's error was harmless and Petitioner's appellate counsel was not ineffective for failing to raise the issue on appeal.   Therefore, Petitioner cannot prevail on the argument that appellate counsel's ineffectiveness caused the procedural default of his trial court error claim and, although already found to be harmless error, Petitioner's claim of trial court error is procedurally barred from habeas review.

## 2.   IAAC Claim Regarding Trial Transcript (Claim Three)

Petitioner asserts that appellate counsel rendered ineffective assistance by failing to raise the issue of the transcription errors regarding the indiscernible side-bar conferences when Jackson was before the trial court.   Petitioner raised this claim in his state petition for

---

[16] Respondents contend that even if Jackson would have testified that Villacana told him that Petitioner was not involved in the murder, Jackson's testimony would have been inadmissible hearsay.  (Doc. No. 37 at 12.)  Because the issue of whether Jackson's testimony would have been precluded by the hearsay rule is irrelevant to the Court's conclusion, it does not express an opinion as to the merit of this argument.

writ of habeas corpus, and the state appellate court summarily denied the petition without a written opinion.  (App. E.)

The absence of recorded bench conferences does not constitute constitutional deprivation unless it renders appellate and post-conviction review impossible.  *See In re Shriner*, 735 F.2d 1236, 1241 (11th Cir. 1984) (holding that habeas petitioner's claim that bench conferences were not recorded was "meritless"); *see also Lacaze v. Leger*, No. CV07-0236-A, 2008 U.S. Dist. LEXIS 37107, at *21-22 (W.D. LA April 3, 2008) ("To merit federal habeas corpus relief, on a claim that state court transcripts are unconstitutionally incomplete, the petitioner must support his claims with more than unsubstantiated speculation.  Petitioner must allege a specific violation of his constitutional rights, and that the missing portions of the transcript preclude meaningful review.").  Further, to prevail on a claim concerning an incomplete transcript, a petitioner must establish that he suffered "actual prejudice" due to the transcription errors.  *See Songer v. Wainwright*, 733 F.2d 788, 792 (11th Cir.) (holding that "the lack of a transcript" of the charge conference in a death penalty case did not warrant issuance of a writ where petitioner "failed to demonstrate that the lack of a transcript" precluded review or that he was actually prejudiced by the absence of the transcript), *vacated* 758 F.2d 552 (11th Cir. 1984), *reinstated*, 769 F.2d 1497 (11th Cir. 1985); *see generally*, Kimberly C. Simmons, J.D., Failure or Refusal of State Court Judge to Have Record Made of Bench Conference with Counsel in Criminal Proceeding, 31 A.L.R. 5th 704 (1995).

As noted previously, Petitioner provided handwritten notes from his trial counsel indicating that she "finished the proffer and began talking to the court about immunity" for Jackson during the indiscernible side-bar conference on page 763 of the trial transcript. (Doc. No. 1, Appendix B, Exhibit 1.)  However, Petitioner provided no similar evidence regarding what occurred during the indiscernible side-bar conference noted at page 769 of the trial transcript.  Respondents assert that the record is sufficient to understand the nature of the transcription errors.

The Court disagrees with Respondents.  As noted previously, Petitioner's proffer of Jackson's testimony occurred during the first indiscernible side-bar, but the substance of that proffer is lost.  Similarly, the subject of the second side-bar cannot be discerned and no amount of additional briefing by the parties will provide its contents.  The Court reiterates that it is inexcusable to have a transcript this deficient, particularly in a first-degree murder case.  *See* Doc. No. 29 at 18.  Nevertheless, as explained *infra*, appellate counsel was not ineffective for failing to bring these two transcription errors to the appellate court's attention.

Petitioner suggests that during one of the indiscernible side-bar conferences, trial counsel may have objected to the court's actions in allowing Jackson to assert a blanket right not to testify without a proper inquiry into the validity and scope of the privilege. (Doc. No. 11 at 15.)  Assuming trial counsel did object, the only prejudice Petitioner arguably would have suffered based on the transcription errors, was that any argument regarding Jackson's Fifth Amendment privilege may not have been preserved for appeal.

23

However, as discussed previously, even if this issue was preserved for appellate review, Petitioner would not have prevailed on the claim because the error was harmless.  Thus, Petitioner has failed to establish that he was prejudiced by appellate counsel's failure to raise the transcription errors.  Accordingly, this claim is denied.

**B.      Robert Cockrell (Claims Four and Five)**

Petitioner contends that appellate counsel should have argued that the trial court erred in overruling his trial counsel's hearsay objection regarding Bass's out-of-court statements as related by Cockrell during his testimony.  (Doc. No. 1 at 12 (citing page 699 of the trial transcript)).  Petitioner further claims that appellate counsel was deficient in failing to bring a related indiscernible side-bar conference to the attention of the appellate court.  (Doc. No. 1 at 7 (citing to page 699 of the trial transcript.))  These claims were rejected by the state appellate court without a written opinion.  (App. E.)

The testimony that Petitioner asserts was erroneously admitted and the transcription error are as follows:

| | |
|---|---|
| Mr. Lafay: | While [Petitioner] was over in J block, did you have a conversation with Albie Bass about what you'd overheard? |
| Cockrell: | Yes. |
| Mr. Lafay: | Tell us what that was. |
| Ms. Munyon: | Objection, Your Honor; hearsay. |
| The Court: | Your response? |
| Mr. Lafay: | May I approach, Judge? |

The Court:          Okay.

WHEREUPON:          There was a side-bar conference, and the proceedings were as follows:

Mr. Lafay:          Well, Judge, it's not for the truth of the matter.  And what it is, is to show - - it's important, I think, to show what information he got from [Petitioner] and what he got from other sources.  Obviously, it's important not to lay information that came out of Albie Bass's mouth.  He's going to say that Bass gave him a couple of facts about the murder and he didn't really talk must about it.  And then he's going to say what Bass told him.  And I think that's important to show that that didn't come from [Petitioner].

The Court:          In effect, it's almost *Brady* material.

**WHEREUPON:          There was an indiscernible side-bar conference, after which the proceedings were as follows:**

The Court:          All right.  Ladies and gentlemen, the statements that you're about to hear are not being offered for the truth of what they state but they're being admitted to establish who the speaker was, that is, who gave this witness the information.

*      *      *

Mr. LaFay:          What did you ask [Bass]?

Cockrell:          Just asked him was it true what [Petitioner] had said about what went on down in Florida.

Mr. LaFay:          And what did he say?

Cockrell:          He told me, yes, it was true.

Mr. LaFay:          Did he give you any details?

| Cockrell: | Well, I asked him what had happened . . . . And he told me that they had took [sic] somebody out, you know, took a girl out. |
| Mr. LaFay: | Did he say how they killed her? |
| Cockrell: | No . . . . I asked him what they did with the body. |
| Mr. LaFay: | What did [Bass] say? |
| Cockrell: | He said he loaded her up in a trunk. |
| Mr. LaFay: | Did you press him anymore for details? |
| Cockrell: | No. |

(App. A at 699-701) (emphasis added).

Given the testimony elicited from Cockrell and the trial court's limiting instruction to the jury, it is clear that the trial court overruled the defense's hearsay objection. This Court previously concluded that the trial court erred by permitting Cockrell to testify to Bass's out-of-court statements. (Doc. No. 29 at 38.) These statements were classic hearsay, and given a complete transcript, effective appellate counsel should have raised the issue on appeal. *Id*. Nevertheless, Petitioner has not demonstrated that he was prejudiced by appellate counsel's failure to raise this issue.

Cockrell's testimony regarding Bass's out-of-court statements was cumulative. On direct examination, Bass was questioned about the same conversation he had with Cockrell while at the jail in Tennessee. (App. A at 381.) He testified that Cockrell had asked him "if what [Petitioner] said was true" regarding having a girl killed in Florida, and he stated that it was. *Id*. Moreover, Cockrell testified that Petitioner spoke freely and provided details

26

about the murder while the two of them were in segregation together.  (App. A at 702-07.)

Finally, as discussed *supra*, the evidence of Petitioner's guilt was overwhelming.

Accordingly, Petitioner has not demonstrated that appellate counsel's failure to raise this

issue on appeal resulted in prejudice, and he cannot succeed on this claim.

With regard to the transcription error on page 699 of the trial transcript,

Respondents submit that "the appellate record was sufficient to alert the appellate court

about the potential hearsay issue of Bass's out-of-court statements to Cockrell."  (Doc. No.

37 at 25.)  Essentially, Respondents argue that the context of the indiscernible side-bar

conference reveals the substance of the conference as a hearsay objection and ruling by the

trial court that the statements were "not offered for the truth of the matter asserted."  (Doc.

No. 15 at 32-33.)  Although the limiting instruction given by the trial court evidences that

the hearsay objection was overruled, the reference to *Brady* material after the objection and

just prior to the indiscernible side-bar conference is confusing.  Respondents suggest that

this statement by the trial court is a "red herring" and was "probably a reference to either

the fact that Petitioner wanted Cockrell to poison Bass or [to] Petitioner's allegation that the

prosecutor was pressuring witnesses into testifying/not testifying by threatening them

with prosecution."  (Doc. No. 37 at 24.)  Petitioner asserts that the *Brady* material the trial

court refers to "was the fact that [he] was never given any opportunity to prepare for the

prosecutor's ambush . . . ."  (Doc. No. 38 at 7.)

This Court concludes that Petitioner has not demonstrated that *Brady* was implicated

by the state court's ruling.  Moreover, Petitioner has not established that he was prejudiced

by the indiscernible side-bar conference.  There is no suggestion that there was any basis for appeal besides whether or not Cockrell's testimony regarding Bass's out-of-court statements were properly admissible.  As discussed *supra*, the admission of the hearsay testimony did not result in prejudice even though improperly admitted.  Thus, appellate counsel did not render ineffective assistance by failing to raise the transcription error in this portion of the record.

### IV.  Conclusion

Any of Petitioner's allegations not specifically addressed herein have been found to be without merit.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.      The remaining claims set forth in the Petition for Writ of Habeas Corpus filed by John Jay Dittrich (Doc. No. 1) are **DENIED** and this case is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment accordingly and close this case.

**DONE AND ORDERED** at Orlando, Florida, this 16th day of July, 2008.

Copies to:
pslc 7/16
Counsel of Record
John Jay Dittrich

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE